

FILED

Apr 10 2015, 9:54 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Richard J. Thonert
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Karl M. Scharnberg
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Johnathon I. Carter,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 10, 2015

Court of Appeals Case No.
02A03-1405-CR-181

Appeal from the
Allen Superior Court

The Honorable Frances C. Gull,
Judge

Cause No. 02D05-1311-FA-46[1]

**Kirsch, Judge.**

---

[1] We note some discrepancy in the cause number in the record before us. The parties' appellate briefs reflect 02D06, as do other filings in the trial court, including the charging information, various motions, and the trial court's final jury instructions. However, the judgment of conviction, transcript, and chronological case summary reflect 02D05, which we elect to use in this opinion.

[1] Following a jury trial, Johnathon I. Carter was convicted of three counts of Class A felony child molesting[2] and two counts of Class C felony child molesting.[3] He raises four issues on appeal that we restate as:

> I. Whether the manner in which the jury was instructed concerning the requirement of jury unanimity constituted fundamental error;
>
> II. Whether the trial court abused its discretion in admitting certain expert testimony;
>
> III. Whether the State presented sufficient evidence to convict Carter;
>
> IV. Whether Carter's ninety-eight-year sentence is inappropriate in light of the nature of the offense and the character of the offender.

[2] We affirm the convictions, revise the sentence, and remand with instructions.[4]

## Facts and Procedural History

[3] On June 28, 2009, Carter married Q.C. ("Mother"), who at that time had three sons, M.S., age fifteen, M.J., age fourteen, and M.N., age eight. Mother and her sons moved from Gary to Fort Wayne in December 2010, and Carter moved shortly thereafter, in January 2011. M.S. had his own room in the residence. M.J. and M.N. shared a bedroom. Between January 2011 and April 2013, the family lived in five different residences in Fort Wayne. M.N. and M.J. shared a bedroom at each of the locations. Carter and Mother worked for

---

[2] *See* Ind. Code § 35-42-4-3(a). We note that, effective July 1, 2014, new versions of the criminal statutes with which Carter was charged were enacted, but because he committed his crimes prior to that date, we will apply the applicable statutes in effect at that time.

[3] *See* Ind. Code § 35-42-4-3(b).

[4] We note that Carter's request for oral argument has been denied by separate order.

the same employer, but generally worked different shifts from each other, such that when Mother was at work, Carter was at home.

[4] From at least early August 2010 to near the end of April 2013, Carter engaged in sexual acts with M.N. The encounters took place at each of the residences where the family lived, usually in M.N.'s bedroom or Carter's bedroom, sometimes happening in the morning after the older brothers had left for school, sometimes in the afternoon when no one else was home, or during the night. Carter would require M.N. to perform oral sex and would also require him to submit to it. He also required M.N. to engage in anal sex. Carter also fondled and touched M.N.'s penis, and Carter required M.N. to touch Carter's penis. Carter bribed M.N. with candy and money.

[5] At some point, M.N. told M.J. what Carter was doing, but M.J. "didn't believe me." *Tr.* at 249. In November 2011, M.N. disclosed to Mother that Carter had been molesting him. Mother and M.N. made a police report to the Fort Wayne Police Department, a department of child services ("DCS") investigation began, and Carter moved out of the residence. On November 23, 2011, Julie DeJesus, a forensic interviewer, interviewed M.N. at the Dr. Bill Lewis Center for Children. DeJesus wore an earpiece, and a multi-disciplinary team[5] listened from another room. M.N. disclosed to DeJesus, with words and demonstrating with his hands, that Carter had abused him. That same day, Sharon Robinson,

---

[5] The multi-disciplinary team consisted of a victim's advocate and a representative from each of the following: law enforcement, child protective services, and the prosecutor's office.

a sexual assault nurse examiner, at the Fort Wayne Sexual Assault Treatment Center, examined M.N. Detective Robin Pfeiffer of the Fort Wayne Police Department separately interviewed M.N. and Carter on November 28, 2011.

[6] M.J. and Carter had an amicable relationship, and M.J. enjoyed spending time with him. M.J. was angry that Carter had left the residence, due to M.N.'s disclosures, and M.J. treated M.N. differently after Carter was gone. M.J. ignored M.N. and was less playful with M.N. He called him a snitch and a coward. M.S. observed M.J. sometimes push M.N. and "tell him to get in the corner or whatever," even though M.N. had done nothing wrong. *Id.* at 430-31. At some point, M.J. asked M.N. if the accusations against Carter were true, and M.N. told M.J. that he had lied about Carter molesting him, but told M.J. not to tell Mother. That same day, M.J. told the school counselor, Shirley Snider that M.N. said that he had made up the accusations against Carter. Snider contacted Detective Pfeiffer who, in turn, contacted Mother. Detective Pfeiffer requested to interview M.N. again, but Mother required that she be present for the interview, which was against police department policy, and the investigation stalled. According to Detective Pfeiffer, the investigation "was closed based on the uncooperation of the family." *Id.* at 559.

[7] In January or February 2012, Carter moved back into the residence, and the molestations resumed. The relationship between Mother and Carter deteriorated, and Carter moved out of the house again in April 2013. Thereafter, on May 2, 2013, M.N. told Mother that Carter had been molesting him again. The investigation resumed. On May 23, 2013, Angela Mellon, a

sexual assault nurse examiner at the Fort Wayne Sexual Assault Treatment Center, examined M.N. Patricia Smallwood, a forensic interviewer at the Dr. Bill Lewis Center for Children also interviewed M.N. in or around May 2013. Detective Pfeiffer interviewed M.N., as well as Carter, on June 5, 2013.

[8] On November 28, 2013, the State charged Carter with three counts of Class A felony child molesting and two counts of Class C felony child molesting. The State alleged: Count I, between August 1, 2010 and April 27, 2013, Carter performed or submitted to sexual deviate conduct by placing his penis in or on the mouth of M.N.; Count II, between August 1, 2010 and April 27, 2013, Carter performed or submitted to sexual deviate conduct by placing his mouth on the penis of M.N.; Count III, between August 1, 2010 and April 27, 2013, Carter performed or submitted to sexual deviate conduct by placing his penis in or on the anus of M.N.; Count IV, between August 1, 2010 and April 27, 2013, Carter performed or submitted to fondling or touching of M.N.; and Count V, August 1, 2010 and April 27, 2013, Carter performed or submitted to fondling or touching of M.N.

[9] At the two-day April 2014 jury trial, "M.N. testified about multiple occasions of many different times, dates and locations of different acts of sexual deviate conduct and fondling." *Appellant's Br.* at 5. M.N., who was ten years old at the time of trial, testified that Carter molested him in all of the places where they lived. Carter sometimes engaged in the conduct after M.N.'s brothers went to school, but before M.N. went to school, sometimes when no one was home, and other times when people were in the house. Carter made M.N. "suck his

thing," meaning Carter's penis, and Carter did the same to M.N. *Tr.* at 237. M.N. described that when he would suck Carter's penis, sperm would come out, although sometimes Carter would wear a condom or put a sock over his penis. *Id.* at 240-41. M.N. described one occurrence, when he was ten years old, in which Carter came into M.N.'s bedroom while he was playing video games before school, and Carter sucked M.N.'s penis. *Id.* at 244-45. On various occasions, M.N. "would give [Carter] masturbation" by using his hands on Carter's penis; M.N. demonstrated at trial how he would hold and move his hand on Carter's penis. *Id.* at 247. Carter would do the same to M.N.'s penis. M.N. also testified that Carter "made [me] put my private in his butt." *Id.* at 240.

[10]     One afternoon, when M.N.'s brothers were at the park, M.N. was in Carter's bedroom, and Carter positioned M.N. "with [his] butt up," and hands on the bed, and Carter put his penis in M.N.'s "butt." *Id.* at 247. M.N. said Carter put his "private part" in M.N.'s "butt" on other occasions and, "[i]t would hurt." *Id.* M.N. also described an incident that occurred while he was sleeping in his bed at night, when Carter came in and engaged in anal sex for about four minutes. *Id.* at 266.

[11]     M.N. testified that, after he reported that Carter was molesting him, and Carter moved out of the residence the first time, M.J. began treating M.N. differently. M.N. said that M.J. was mean to him and would call him a coward, punk, and "the b-word." *Id.* at 431. M.N. told the jury that, with Carter out of the house, he knew that Mother was struggling to work and supervise the children on her

own. M.N. explained that the reason that he previously had recanted, saying that the allegations were not true, was because he wanted to help Mother. Carter returned to the home, and the molestations resumed. M.N. testified that Carter, after coming back, asked him, "Why did you tell on me?" *Id*. at 248.

[12] In her testimony, Mother mentioned that after Carter left the family's residence in November 2011 M.J. cried and missed him, and she observed that M.J. was "standoff-ish" to M.N. *Id*. at 460. Mother was aware that during the period of time when Carter was not living at the residence, but before M.N. recanted, M.J. and Carter were in contact with one another and exchanged text messages. Carter returned in January or February 2012, but she "put him out" in late April 2013 due to difficulties in their marriage. *Id*. at 469.

[13] The State also presented, over Carter's objections, the testimony of Smallwood, a forensic interviewer and expert on child sexual abuse. Carter had filed a motion to exclude Smallwood's testimony, which the trial court denied, and he made continuing objections both prior to opening statement and during her testimony. At trial, Smallwood testified that she had been a family and child sexual abuse counselor for over twenty years, having worked as a marriage and family therapist at Parkview Hospital and as the Director of Victim Assistance at the Allen County Sheriff's Department and the Fort Wayne Police Department. She interviewed M.N. in May 2013, but she did not testify about M.N. or his individual case, instead offering generalized testimony about how children deal with sexual abuse, the disclosure process, and the matter of when and why children recant or retract their disclosures of abuse. She testified that a

one-time incident of molestation is rare and that it is harder for boys to talk about abuse that happens to them. She also stated that the longer a child waits to disclose, the stronger the feeling that they will not be believed. Boys are also more likely to retract. When a child retracts, it does not mean that it did not happen. She testified that sexual abuse tends to place a child in a position of having to choose between disclosing the abuse and wrecking the family, or keeping the secret and suffering the abuse. *Id.* at 515. The pressure on children to keep the family intact is intense. She stated that frequently, by the time of disclosure, the child has been abused so many times that individual instances tend to run together and children have difficulty relating specific events or providing details. Carter requested a limiting instruction as to Smallwood's testimony and a motion for mistrial, which the trial court denied.

[14] DeJesus, who conducted a forensic interview of M.N. in November 2011, also testified that M.N. disclosed to her that Carter had been abusing him. Robinson, the sexual assault nurse examiner, also testified at trial, over Carter's objections, and his request for mistrial was denied. Robinson testified that, while she did not observe any injuries to M.N. during her examination of him in November 2011, a lack of injury does not mean an assault did not occur and that, in the vast majority of cases, there is no visible injury. M.N. described incidents of sexual acts, including sucking of Carter's private part and Carter inserting that into M.N.'s "butt." *Id.* at 363. M.N. told her that Carter "whooped" him and that it hurt. M.N. told her that the molestations "happened lots of times." *Id.* at 364. Mellon, who physically examined M.N.

in May 2013, testified that M.N. explained and demonstrated to her that Carter touched his private parts and put his private parts "in [his] butt lots of times." *Id*. at 386. On other occasions, M.N. told her "sperm" or "stuff" had come out of Carter's penis. *Id*. at 387.

[15] Following the presentation of evidence, Carter tendered a final jury instruction regarding jury unanimity, which was denied over his objection. The jury convicted Carter, as charged, of five counts of child molesting. The trial court imposed an aggregate sentence of ninety-eight years, consisting of three consecutive thirty-year sentences on each of the three Class A felonies and to two consecutive four-year sentences for each of the two Class C felonies. Carter now appeals his convictions and his sentence. Additional facts will be supplied as necessary.

## Discussion and Decision

## I. Jury Unanimity Instruction

[16] Carter contends the trial court erred by rejecting his tendered final jury instruction regarding jury unanimity. The manner of instructing a jury lies largely within the discretion of the trial court, and we will reverse only for an abuse of discretion. *Surber v. State*, 884 N.E.2d 856, 867 (Ind. Ct. App. 2008), *trans. denied*. In determining whether a trial court abused its discretion by declining to give a tendered jury instruction, we consider (1) whether the tendered instruction correctly states the law; (2) whether there was evidence presented at trial to support giving the instruction; and (3) whether the

substance of the instruction was covered by other instructions that were given. *Brakie v. State*, 999 N.E.2d 989,993 (Ind. Ct. App. 2013), *trans. denied*. We consider jury instructions not in isolation, but as a whole, with reference to each other. *Surber*, 884 N.E.2d at 867. "'Errors in the giving or refusing of instructions are harmless where a conviction is clearly sustained by the evidence and the jury could not properly have found otherwise.'" *Brakie*, 999 N.E.2d at 993 (quoting *Dill v. State,* 741 N.E.2d 1230, 1233 (Ind. 2001)).

[17] With regard to jury unanimity, Indiana has long required that a verdict of guilty in a criminal case "must be unanimous." *Baker v. State*, 948 N.E.2d 1169, 1173 (Ind. 2011). Our Supreme Court has recognized that applying the rule of jury unanimity can present difficult challenges in child molestation or sex offense cases. *Id.* at 1174. One reason for this is because often a child is abused by an individual who resides with the child and that person "'perpetuate[s] the abuse so frequently . . . that the young child loses any frame of reference in which to compartmentalize the abuse into distinct and separate transactions. Such evidence of abuse has been termed generic evidence.'" *Id.* (quoting *R.L.G. v. State,* 712 So.2d 348, 356 (Ala. Crim. App. 1997)). In such a situation, "[t]he victim's 'generic testimony' may describe a pattern of abuse ('every time mama went to the store') rather than specific incidents ('after the July 4th parade')." *Id.* A concern about jury unanimity may arise because the jury is not presented with a specific act upon which its members unanimously may agree. *Id.* Indeed, the jury may be presented with evidence of a greater number of separate

criminal offenses than the defendant is charged with in the information. *Id.* at 1175.

[18] Here, the State charged that Carter, between August 1, 2010 and April 27, 2013, committed child molesting by three acts of sexual deviate conduct – placing his penis in or on M.N.'s mouth, placing his mouth on M.N.'s penis, and placing his penis in or on M.N.'s anus – and two acts of fondling or touching of M.N. Thus, while at least the first three counts identified an act by description, they did not specify a date or location or other specific detail; instead, the charges each alleged a date range within which the conduct occurred.[6] On appeal, Carter complains that, although he was charged with one count of child molesting in each count, the jury heard evidence of multiple acts of molestation over an extended period of time. Therefore, he claims, it is "probable" that a juror or jurors found him guilty of some charged and/or some uncharged conduct, but not guilty of some charged crimes, or a combination thereof, and that "a non-unanimous verdict was the result." *Appellant's Br.* at 9. Essentially, his complaint is that there is no way of knowing which particular act or acts, if any, the jury unanimously agreed upon.

---

[6] Our Supreme Court has recognized that time is not of the essence in the crime of child molesting. *Barger v. State,* 587 N.E.2d 1304, 1307 (Ind. 1992). This is so because "it is difficult for children to remember specific dates, particularly when the incident is not immediately reported as is often the situation in child molesting cases." *Id.* Therefore, the precise time and date of the commission of a child molestation offense generally is not regarded as a material element of the crime. *Id.*

[19] At trial, Carter tendered a final jury instruction regarding jury unanimity that separately stated, for each of the five counts, that

> In order to find the Defendant guilty of Count [I, II, III], each of you must agree, your verdict must be unanimous, upon the commission of a specific act of Criminal Deviate Conduct.
>
> . . . .
>
> In order to find the Defendant guilty of Count [IV, V], each of you must agree, your verdict must be unanimous, upon the commission of a specific act of fondling or touching.

[20] *Appellant's Amended App. Vol. 1* at 29-20, 32-33. The trial court rejected the instruction, finding that it was covered by other of the trial court's instructions. On appeal, Carter argues that the trial court erred by rejecting the instruction and claims the trial court failed to properly instruct the jury regarding the requirement of jury unanimity. The State maintains that the trial court's decision to refuse the instruction was proper because it was not a correct statement of the law. Based on the facts and circumstances of this case, we agree with the State.

[21] In reaching this decision, we rely on our Supreme Court's instructive analysis in *Baker*, which presents facts similar to those before us. There, Baker was charged with one count of child molesting for each of the three alleged victims; however, the jury heard evidence of multiple acts of molesting for each victim. On appeal, Baker argued that some jurors may have relied on different evidence than the other jurors to convict him on each of the three counts. The *Baker* Court's analysis recognized that "the State may in its discretion designate a

specific act (or acts) on which it relies to prove a particular charge"; however, if the State does not so designate, jurors should be instructed that in order to convict, they must "either unanimously agree that the defendant committed the same act or acts or that the defendant committed all of the acts described by the victim and included within the time period charged." *Id.* The *Baker* Court adopted the reasoning of the California Supreme Court, which explained that this type of instruction, "'in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim.'" *Id*. at 1177 (quoting *People v. Jones*, 270 Cal. Rptr. 611, 792 P.2d 643, 650 (1990)). The California Supreme Court further observed, "[C]redibility is usually the 'true issue' [and] the jury either will believe the child's testimony that the consistent repetitive patter of acts occurred or disbelieve it." *Id*. In this case, Carter's proposed instruction did not instruct the jury that it must unanimously agree that he committed all of the acts described by M.N. Thus, it was not a complete and correct statement of the law, and the trial court did not abuse its discretion when it rejected it.

[22] That being said, Carter's jury received the general jury-unanimity instruction, which stated, in part, "Each of you must refuse to vote for conviction unless you are convinced beyond a reasonable doubt of the defendant's guilt. Your verdict must be unanimous . . . The foreperson will preside over your deliberations and must sign and date the verdict to which you all agree." *Appellant's Amended App. Vol. 1* at 52, 55. The *Baker* Court held that such an

instruction – which "did not advise the jury that in order to convict Baker the jury must either unanimously agree that he committed the same act or acts or that he committed all of the acts described by the victim and included within the time period charged" – was insufficient. *Baker*, 948 N.E.2d at 1178. Because the defendant in *Baker* neither objected nor offered an instruction of his own, our Supreme Court analyzed the issue using the fundamental-error doctrine. *Id*. The *Baker* Court found that the only issue was the credibility of the alleged victims, *i.e.*, whether they were lying, and "the jury resolved the basic credibility dispute against [Baker] and would have convicted him of *any* of the various offenses shown by the evidence to have been committed." *Id*. at 1179 (emphasis in original). Accordingly, the *Baker* Court held there was no fundamental error. *Id*.

[23] Unlike Baker, Carter objected to the trial court's instruction and submitted one of his own. However, as we have explained, Carter's tendered instruction was not a correct statement of the law, or at least not a complete one. "[A] party who fails to tender a correct instruction waives any error regarding an incomplete or omitted instruction unless the error is fundamental." *Carson v. State*, 686 N.E.2d 864, 865 (Ind. Ct. App. 1997), *trans. denied*. The purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. *Id*. The determinative question is whether the error by itself infected the entire trial such that the resulting conviction violates due process. *Id*. Thus, we must determine here whether the instructional error

was fundamental. Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible. *Ryan v. State*, 9 N.E.3d 663, 667-68 (Ind. 2014). In *Ryan*, our Supreme Court recently addressed the fundamental error doctrine, there in the context of alleged prosecutorial misconduct, and recognized that our task includes reviewing all relevant information given to the jury. It stated:

> In evaluating the issue of fundamental error, our task in this case is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury – *including evidence admitted at trial, closing argument, and jury instructions* – to determine whether the misconduct had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible.

[24] *Id*. at 667-68 (emphasis added and internal cites and quotes omitted); *see also Manuel v. State*, 793 N.E.2d 1215, 1218 (Ind. Ct. App. 2003) (when determining whether instructional error resulted in fundamental error, we look to all relevant information given to jury, including closing argument and other instructions), *trans. denied*.

[25] As was the case in *Baker*, the case before us largely turns on credibility. The jury heard evidence that M.N. was forced to perform oral sex upon Carter, and submit to oral sex performed by Carter, submit to and perform anal intercourse, and fondle and touch Carter's penis, and submit to Carter touching him. He reported the abuse to M.J., who did not believe him, and to Mother twice. He repeated the allegations to multiple interviewers and nurse examiners. The

main issue for the jury to resolve was whether M.N. was telling the truth with regard to Carter's acts of molestation.

[26] We note that the prosecutor in closing argument specifically addressed what evidence established which acts as alleged in the charges. That is, although she recognized that "[M.N.] told you that these things happened a lot," she thereafter identified a number of specific acts as they related to each count. *Tr.* at 583. For instance, she reminded the jury that M.N. described three different types of deviate sexual conduct, relative to Counts I, II, and III: Carter put his penis in M.N.'s anus; Carter sucked M.N.'s penis; and Carter made M.N. suck his. *Id*. at 582-84. With regard to Counts IV and V, fondling and touching, she reminded the jury that M.N. verbally described and demonstrated with his hand the manner in which Carter touched M.N.'s penis and required M.N. to touch his. With regard to unanimity, she further told the jury, "[T]here's twelve of you and you all have to be in agreement on your decision and you have to agree that the acts that [M.N.] described did, in fact, occur in order for you to find the Defendant guilty and it has to be unanimous." *Id*. at 585. We also observe that each member of the jury was polled as to the verdict, and each member affirmed his or her agreement. Considering all relevant information that was before the jury, we conclude, as did the Court in *Baker,* that Carter has failed to demonstrate that any instructional error constituted fundamental error.

# II. Admission of Expert Testimony

[27] Carter claims that the trial court erred when it admitted Smallwood's testimony. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we will review the admission of evidence solely for an abuse of discretion. *Bradford v. State,* 960 N.E.2d 871, 873 (Ind. Ct. App. 2012). An abuse of discretion occurs where the decision is clearly against the logic and effect of the facts and circumstances before the court. *Hoglund v. State,* 962 N.E.2d 1230, 1237 (Ind. 2012). However, even if the trial court erroneously admits evidence, such error will be disregarded unless it affects the substantial rights of a party. *Id.* at 1238. Specifically, we look to the probable impact of the erroneous admission on the jury. *Id.* The improper admission of evidence is harmless error if the conviction is supported by substantial evidence of guilt satisfying this court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.* Here, Carter argues that the trial court abused its discretion when it admitted the testimony of Smallwood, over his objections, request for limiting instruction, and motion for mistrial. He claims that her testimony impermissibly vouched for M.N.'s credibility and ultimately denied him a fair trial.

[28] Regarding improper vouching testimony generally, Indiana Evidence Rule 704(b) provides that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." Such vouching testimony is an invasion of the province of the jurors in determining the weight

they should place upon a witness's testimony. *Gutierrez v. State,* 961 N.E.2d 1030, 1034 (Ind. Ct. App. 2012). It is essential that the trier of fact determine the credibility of the witnesses and the weight of the evidence. *Id.*

[29] During its case-in-chief, and after M.N. testified, the State presented the testimony of Smallwood, over Carter's objections. Smallwood, a forensic interviewer at the Dr. Bill Lewis Center for Children, provided expert testimony concerning the dynamics of child abuse, the disclosure process, and when and why a child may recant his disclosure of the abuse. Smallwood testified to a number of factors that contribute to a child's delay in disclosing abuse, including secrecy, lack of witnesses, fear or shame, and worry about keeping the family intact. She noted that "a real gender issue" exists, and studies reveal that it is more difficult for males to disclose sexual abuse. *Tr.* at 516. She also recognized the fact that with delayed disclosure, the child may face the skepticism associated with "why are you telling now?" *Id.* Smallwood continued that sometimes children retract or recant their statement; she stated that a child may recant because the abuse did not happen or may do so because, once they report the abuse, the family is pulled apart, which is exactly what they feared would occur. They may feel the effects of anger or lack of support, a sense of, "[L]ook, you made this happen." *Id.* at 518. In this situation, a child might feel responsible for "putting it all back together, so they take it back, they say it didn't happen." *Id.*

[30] We disagree with Carter that Smallwood's testimony ran afoul of Indiana Evidence Rule 704(b). Although Smallwood interviewed M.N., she never

mentioned M.N. in her testimony or made any statement or opinion regarding the truth or falsity of M.N.'s allegations of molestation. Smallwood did not purport to have any opinion regarding the case at bar, nor did she refer to any specific facts at issue. Her testimony was broad, generalized, and included reference to results of research studies. In her testimony, she confirmed that a recantation could mean that no abuse had occurred. We note, and as the State reminds us, this court has permitted expert testimony explaining the behaviors and dynamics associated with domestic violence, including that associated with why a victim may recant. *Otte v. State*, 967 N.E.2d 540, 548 (Ind. Ct. App. 2012), *trans. denied*. The *Otte* court noted that "the reactions and behaviors of domestic violence victims are not commonly understood by laypersons," and "testimony regarding a victim's propensity to recant . . . simply provides the jury with information outside its experience, permitting it to assess credibility based upon a more complete understanding of all potential factors at issue." *Id*. We find that Smallwood's testimony likewise provided information to the jury beyond that commonly understood by laypersons, and, under the circumstances before us, her expert testimony did not constitute impermissible vouching testimony.

## III. Sufficiency of the Evidence

[31]   Carter next asserts that the evidence was not sufficient to convict him. When reviewing the sufficiency of evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the trial court's decision. *Young v. State*, 973 N.E.2d 1225, 1226 (Ind. Ct. App. 2012), *trans.*

*denied*. It is the role of the trier-of-fact to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* "To preserve this structure, when we are confronted with conflicting evidence, we consider it most favorably to the trial court's ruling." *Id.* It is not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is sufficient if an inference reasonably may be drawn from it to support the trial court's decision. We will affirm a conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* We note that it is well settled that the uncorroborated testimony of the victim, even if the victim is a minor, is sufficient to sustain a conviction for child molesting. *Morrison v. State,* 462 N.E.2d 78, 79 (Ind. 1984).

[32] Carter was convicted of three counts of Class A felony and two counts of Class C felony child molesting. In order to convict Carter of Class A felony child molesting, the State was required to prove beyond a reasonable doubt that Carter, over age twenty one, knowingly or intentionally performed or submitted to deviate sexual conduct with M.N. when he was under fourteen years of age, namely: Carter placed his penis in or on M.N.'s mouth, he placed his mouth on M.N.'s penis, and he placed his penis in M.N's anus. Ind. Code § 35-42-4-3; *Appellant's Amended App. Vol. 2* at 1-3. The offense of child molesting as a Class C felony is set forth in Indiana Code section 35-42-4-3(b), which provides, "A person who, with a child under fourteen (14) years of age, performs or submits to any fondling or touching, of either the child or the older person, with intent to arouse or to satisfy the sexual desires of either the child or the older person,

commits child molesting, a Class C felony." Mere touching alone is insufficient to constitute the crime of child molesting. *Bass v. State*, 947 N.E.2d 456, 460 (Ind. Ct. App. 2011), *trans. denied*. The State must also prove beyond a reasonable doubt that the act of touching was accompanied by the specific intent to arouse or satisfy sexual desires. *Id.* The intent element of child molesting may be established by circumstantial evidence and may be inferred from the actor's conduct and the natural and usual consequence to which such conduct usually points. *Id.*

[33] Here, M.N. testified that the molestations occurred in each of the five homes in which they lived. He testified to acts of deviate sexual conduct as charged. He testified that Carter touched his penis and that Carter made M.N. "give him masturbation" and that sometimes Carter ejaculated; from this the jury could infer the intent to arouse or satisfy sexual desires. *Tr.* at 247. Carter invokes the incredible dubiosity rule to claim that M.N.'s "uncorroborated testimony was so unreliable and untrustworthy" that his convictions must be reversed. *Appellant's Br.* at 28. The incredible dubiosity rule provides that a court may impinge on the jury's responsibility to judge witness credibility only when confronted with inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. *Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002). Application of this rule is rare, and "'[T]he standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.'" *Hampton v. State*, 921 N.E.2d 27, 29 (Ind. Ct. App. 2010) (quoting *Fajardo v. State*, 859 N.E.2d 1201,

1208 (Ind. 2007), *trans. denied*. The rule applies only when a witness contradicts herself or himself in a single statement or while testifying, and does not apply to conflicts between multiple statements. *Manuel v. State,* 971 N.E.2d 1262, 1271 (Ind. Ct. App. 2012). Cases where we have found testimony inherently improbable have involved situations either where the facts as alleged "could not have happened as described by the victim and be consistent with the laws of nature or human experience," or where the witness was so equivocal about the act charged that her uncorroborated and coerced testimony "was riddled with doubt about its trustworthiness." *Watkins v. State,* 571 N.E.2d 1262, 1265 (Ind. Ct. App. 1991), *aff'd in relevant part,* 575 N.E.2d 624 (Ind. 1991). Carter cannot fit his case into either category.

[34] Carter suggests that the events as described by M.N. "could not have happened" and "were contrary to common sense and human experience" because there was no medical, physical, or eye-witness testimony. *Appellant's Br.* at 26-27. He points to "exculpatory eye-witness testimony" of his brothers and Mother who "had never seen, had no personal knowledge [of], nor were they aware of any act of sexual misconduct between Carter and M.N." *Id.* at 10. His argument seems to be that the molestation could not have happened in the house without someone hearing it or seeing it, particularly those acts that M.N. described happened in his bedroom while M.J. was also present. We disagree. Some of the acts happened when family members were home, while others occurred while no one was home. That no other person testified to

witnessing or hearing M.N. being molested does not establish that the abuse did not happen.

[35] We also reject Carter's argument that M.N.'s testimony was untrustworthy and contradictory. Carter makes much of the fact that M.N. told M.J. that he had fabricated the molestation accusations. *Id.* at 24 ("concerning the lies of M.N."), at 28 ("M.N. stated that he lied" and "the only reason the lie came out"). However, M.N. testified at trial that, in fact, the molestations did occur, both before Carter moved out in November 2011 and after he returned in early 2012, and he explained that his reason for untruthfulness to M.J. was to help Mother, who M.N. realized was struggling as a single parent and without Carter at home to help supervise the children and run the household. M.N.'s testimony was consistent, and at no time did he contradict himself while testifying. Furthermore, his testimony was consistent with his reports of abuse to the forensic interviewers and nurses who performed examinations of him. The jury had the opportunity to hear M.N.'s testimony and to determine his credibility. We decline Carter's invitation to impinge on the province of the jury and reassess that credibility. The State presented sufficient evidence to convict Carter of the charged offenses.

## IV. Appropriateness of Sentence

[36] Finally, Carter challenges his ninety-eight-year executed sentence for the three Class A and two Class C felony convictions. Carter urges us to find that the trial court "abused its discretion" when it sentenced Carter because the decision is clearly against the logic and effect of the facts and circumstances before the

trial court. *Appellant's Br.* at 2, 12-13, 29. A trial court can abuse its discretion by (1) issuing an inadequate sentencing statement; (2) finding aggravating or mitigating factors that are not supported by the record; (3) omitting factors that are clearly supported by the record and advanced for consideration; or (4) by finding factors that are improper as a matter of law. *Laster v. State*, 956 N.E.2d 187, 193 (Ind. Ct. App. 2011). Carter's argument, however, focuses not on the sentencing statement or on aggravators and mitigators, but on his age, character, steady employment and lack of criminal history, maintaining that these factors warrant a reduction in his sentence.[7] Accordingly, we review Carter's sentence under Appellate Rule 7(B), which allows us to revise a sentence if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. It is the defendant's burden on appeal to persuade the reviewing court that the sentence imposed by the trial court is inappropriate. *Chappell v. State*, 966 N.E.2d 124, 133 (Ind. Ct. App. 2012), *trans. denied*. "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State,* 895 N.E.2d 1219, 1224 (Ind. 2008). Upon appellate review,

---

[7] We remind counsel that whether a trial court has abused its discretion by improperly recognizing aggravators and mitigators when sentencing a defendant and whether a defendant's sentence is inappropriate under Indiana Appellate Rule 7(B) are two distinct analyses. *Hape v. State*, 903 N.E.2d 977, 1000 n.12 (Ind. Ct. App. 2009), *trans. denied*.

we have the power to affirm, reduce, or increase the sentence. *Akard v. State,* 937 N.E.2d 811, 813 (Ind. 2010).

[37] Carter's Class A felony child molesting convictions subjected him to imprisonment for a fixed term of between twenty and fifty years, with the advisory being thirty years. Ind. Code § 35-50-2-4. Carter's Class C felony child molesting conviction subjected him to imprisonment for a fixed term of between two and eight years, with the advisory being four years. Ind. Code § 35-50-2-6(a). As to the nature of the offense, the advisory sentence is the starting point that the legislature has selected as an appropriate sentence for the crime committed. *Anglemyer v. State,* 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind. 2007).

[38] Here, the trial court sentenced Carter to the advisory sentence of thirty years for the Class A felony convictions and the advisory sentence of four years for the Class C felony convictions, ordering the sentences to be served consecutively to one another for a total of ninety-eight years. Carter argues that the nature of the offense does not justify such a lengthy sentence because he "made no threat to M.N," and he did not beat or "severely brutalize" M.N. except as was inherent in the commission of the crime. *Appellant's Br.* at 29; *Reply Br.* at 16. He further asserts that his character, likewise, does not justify the imposed ninety-eight-year sentence because he had no prior criminal history, he had a history of steady employment, and he was young, twenty-two years old at the start of the allegations and twenty-five at the time of sentencing. He also presented to the trial court letters from a number of individuals who pointed out

that he had no prior trouble with the law, kept a job, was hard-working, and was family-oriented. Carter asserts that he possesses the potential for reformation and rehabilitation that would allow him to return as a productive member of society.

[39] The State responds that Carter systematically and repeatedly abused eight-year-old M.N., who called him "dad." The State opines that it was "mind-boggling" that Carter "had within his grasp a complete reprieve," when M.N. recanted his allegations, and due to the family's unwillingness to cooperate with law enforcement, the investigation stalled; Carter could have "walked away" from charges of Class A felonies by no longer committing them. *Appellant's Br.* at 21. However, upon returning to the home, Carter resumed molesting M.N., thereby "capitalizing" on M.N.'s self-sacrificing love for his mother. *Id*. at 22. The State argues that, although Carter was only twenty-two years of age when the offenses began, he was "old enough to know better." *Id*.

[40] Carter occupied a position of trust with M.N., and his offenses are undeniably serious. However, on balance of all the factors, we find that the ninety-eight-year sentence is out of range of appropriate results. We revise Carter's sentence to two consecutive thirty-year terms for two of the Class A felony convictions and to one concurrent thirty-year term for the third Class A felony, plus two consecutive four-year terms on the Class C felony convictions, for an aggregate sentence of sixty-eight years. We affirm Carter's convictions and remand the case to the trial court with instructions to enter such sentence.

Affirmed and remanded with instructions.

Friedlander, J., and Crone, J., concur.