## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 31 2020, 11:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ryan M. Gardner
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin J. Shoptaw
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| William J. Ray, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | August 31, 2020 <br><br> Court of Appeals Case No. 19A-CR-2869 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable David M. Zent, Judge <br><br> Trial Court Cause No. 02D06-1812-F3-73 |

**Tavitas, Judge.**

# Case Summary

William Ray appeals his convictions for Count I, rape, a Level 3 felony; Count II, kidnapping, a Level 5 felony; Count III, criminal confinement, a Level 5 felony; Count IV, burglary, a Level 5 felony; Count V, sexual battery, a Level 6 felony; and his status as an habitual offender. We affirm.

# Issue

Ray raises one issue for our review, which we revise and restate as whether the trial court abused its discretion in the admission of certain evidence.

# Facts

At approximately 8:15 a.m. on November 29, 2018, Leila Thomas dropped her fifteen-year-old daughter,[1] J.T., off at her school bus stop in Fort Wayne. Thomas left J.T. at the bus stop because Thomas had to leave for work. While waiting at the bus stop, J.T. made a Facetime call to her best friend, J.W., which she typically did in the morning while at the bus stop. J.T. placed the phone in her pocket while she spoke with J.W. from her headphones.

Suddenly, Ray "grabbed [J.T.] from behind." Tr. Vol. III p. 155. Initially, J.T. thought a friend grabbed her, so she asked the person to stop; however, J.T. quickly realized that the person was not a friend and started kicking to get away from Ray. J.T. nearly escaped before Ray hit J.T. on her right side, causing

---

[1] It appears that J.T. was fifteen at the time of the offense; however, J.T. was sixteen at the time of trial.

J.T. to fall down. Ray dragged J.T. to an alley and forced her into a shed. Ray pulled down J.T.'s pants and underwear, started kissing J.T. "all over [her] face." *Id.* at 157. Ray then touched J.T.'s vagina with his fingers. Ray pulled down his pants and began to put on a condom.

[5] J.W., who remained on the phone during the incident, heard J.T. screaming for help and to be released and, moments later, heard Ray tell J.T. to take her pants off. At some point, J.T.'s earphones became disconnected from her phone, and Ray heard J.W., which caused Ray to "panic[ ]." *Id.* at 157. J.W. disconnected the call with J.T. and called J.T.'s mother, Thomas. Thomas began driving back to the bus stop and called law enforcement. J.W. also called law enforcement.

[6] Meanwhile, Ray covered J.T.'s head with a hat and led her away from the shed to a nearby house. Once inside the house, Ray attempted to shut off J.T.'s phone. J.T. told Ray not to hurt her, and Ray said he was going to take J.T. back to the bus stop.

[7] Ray again placed the hat on J.T.'s head and began to take J.T. back to the bus stop. Thomas arrived on the scene and saw that Ray had J.T. in a "headlock." *Id.* at 201. Ray released J.T. from the headlock and began running, and Thomas began to chase Ray with her vehicle while she waited for police arrive. Thomas followed Ray down an alley, where Ray was forced to stop running, and Thomas photographed Ray. Law enforcement arrived on the scene, and Ray was taken into custody.

[8] The State filed an information, which was later amended, and charged Ray with: Count I, rape,[2] a Level 3 felony; Count II, kidnapping, a Level 5 felony; Count III, criminal confinement, a Level 5 felony; Count IV, burglary, a Level 5 felony; and Count V, sexual battery, a Level 6 felony. On July 31, 2019, the State filed a notice of intention to seek an habitual offender enhancement.

[9] At Ray's October 2019 jury trial, witnesses testified to the foregoing facts. Relevant to this appeal, the following witnesses also testified sequentially to the following events. First, J.T. testified that Ray touched J.T.'s vagina with his fingers. Second, Officer Manuel Aguilar, with the Fort Wayne Police Department, testified that when he arrived on the scene, Thomas reported "that's the man who raped my baby." *Id.* at 229. Officer Aguilar also testified that J.T. reported to him that Ray "put his finger in her vagina" and that Ray "had [his penis] out" but did not insert his penis into her vagina. *Id.* at 231. Ray did not object when Officer Aguilar made these statements.

[10] Next, Drew Kellogg, the paramedic who arrived on the scene, testified that J.T.'s chief complaint was that she was "sexually assaulted." Tr. Vol. IV p. 57. Ray objected to Kellogg's testimony, arguing that it was repetitive and constituted vouching for J.T. The trial court directed the State to refrain from asking Kellogg questions about J.T.'s complaints. Kellogg then testified that

---

[2] The State filed an amended information on Count I on January 31, 2019, due to a scrivener's error.

J.T. "did not go into any detail" and that J.T. "had no visible injuries." *Id.* at 59.

[11] Lorrie Freiburger, a forensic interviewer with the Dr. Bill Lewis Center for Children, testified that she interviewed J.T. on November 29, 2018. On direct examination, the deputy prosecutor and Freiburger engaged in the following colloquy:

> Q. [Freiburger], with respect to J.T. we're not gonna go into any of the content of the interview, that would be hearsay. We had an opportunity to meet her yesterday. What was her demeanor like, though, when you spoke to her? How did she present?
>
> A. Oh, she was [ ] she communicated very well. I mean, she was able to articulate a lot of details about what happened, she was very - had been very aware of her surroundings and were [sic] able to retain those and then give those back to me. She was not afraid to correct me if I repeated something back that —

*Id.* at 99. Ray objected and argued that Freiburger's testimony was "getting past demeanor and we're talking about ability to recall things. We're getting close to vouching of this witness." *Id.* The trial court agreed and reminded Freiburger that the question referred to J.T.'s demeanor. Freiburger responded: "Oh, very confident, very – was able to communicate well, and was – I want to say helpful in an interview. I mean." *Id.* Ray moved to strike Freiburger's latter comment, which the trial court granted and struck from the record. Finally, the State elicited testimony from Freiburger regarding the difference

between an interview room and the courtroom as a child-friendly environment. Ray did not cross-examine Freiburger.

[12] J.T.'s medical examination report, which included a statement made by J.T. to Leslie Cook, a forensic nurse examiner at the Fort Wayne Sexual Assault Treatment Center, was also admitted at trial. The report restated J.T.'s versions of events, as reported to Cook, as follows: "[Ray was] rubbing on [J.T.] – [J.T.'s] vagina with his fingers, trying to stick his fingers inside [J.T.] He d[id], both inside [and] outside." State's Ex. Vol. p. 168. Ray objected and argued that, while J.T.'s statement contained in Cook's report would ordinarily be admissible for medical purposes, the statement would be a drumbeat repetition of the earlier testimony by J.T., Officer Aguilar, and Kellogg. The trial court overruled Ray's objection.

[13] The jury found Ray guilty of all five counts and found Ray to be an habitual offender. The trial court sentenced Ray to an aggregate sentence of fifty-two years at the Indiana Department of Correction. Ray now appeals his conviction.

## Analysis

[14] Ray argues that the trial court abused its discretion in the admission of certain evidence. "The general admission of evidence at trial is a matter we leave to the discretion of the trial court." *Clark v. State*, 994 N.E.2d 252, 259-60 (Ind. 2013). "We review these determinations for abuse of that discretion and

reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Id.* at 260.

### *A. Did the evidence constitute a drumbeat repetition?*

[15]     Ray argues that J.T.'s testimony, followed by subsequent witnesses who testified to J.T.'s out of court statements recounting the allegations, constituted a drumbeat repetition in evidence, which was prejudicial to Ray. In *Kress v. State,* 133 N.E.3d 742, 746-47 (Ind. Ct. App. 2019), *trans. denied,* a panel of our court summarized the law and concerns regarding drumbeat repetition of evidence as follows:

> In a criminal case, the core issue at trial is, of course, what the defendant did (or did not do), not why someone else did (or did not do) something. For this reason, the Indiana Supreme Court has urged courts to take caution when a prosecutor offers an otherwise[]inadmissible assertion for the purpose of providing context for the jury. Indeed, when an out-of-court assertion is offered for some ancillary purpose, we must pay careful attention to that proffered purpose. This is because Indiana Evidence Rule 403 contemplates exclusion where the probative value of the evidence is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Evid. R. 403. . . . In short, Indiana law does not permit minimally probative end runs around the rule against hearsay. Thus, "[i]f the fact sought to be proved under the [proffered] non-hearsay purpose is not relevant, or it is relevant but its danger of unfair prejudice substantially outweighs its probative value, the hearsay objection should be sustained." *Craig v. State*, 630 N.E.2d 207, 211 (Ind. 1994).

One danger of prejudice arises in the "drumbeat repetition" of an out-of-court assertion. *See, e.g., Modesitt v. State*, 578 N.E.2d 649, 651-52 (Ind. 1991). Indeed, in light of a proffered non-hearsay purpose, exclusion might not be warranted where there is a mere isolated reference to an assertion. *See* Evid. R. 403. However, as additional testimony about the assertion "beats the drum," there is increasing danger the jury will use the testimony for an improper purpose. For example, the jury might use the testimony as proof of the matter asserted. . . . Or, the jury could treat the repetitive testimony as a form of vouching for the credibility of the declarant. . . . As to the latter risk, this type of problematic vouching is not the blatant type prohibited by Evidence Rule 704(b)—where a witness directly opines about "the truth or falsity of allegations" or "whether a witness has testified truthfully." Evid. R. 704(b). Rather, the risk is insidious. That is, the repeated references might eventually inundate the jury, leading them toward an inference that witnesses are vouching for the credibility of the declarant. *See, e.g., Stone v. State*, 536 N.E.2d 534, 540 (Ind. Ct. App. 1989) (identifying impermissible vouching where the victim's credibility "became increasingly unimpeachable as each adult added his or her personal eloquence, maturity, emotion, and professionalism to [the] out-of-court statements"), *trans. denied*.

*Kress*, 133 N.E.3d at 746-47 (some citations and quotations omitted).

[16]     In support of his argument that the trial court abused its discretion in admitting drumbeat repetition evidence, Ray points to the following:[3] (1) J.T.'s testimony

---

[3] Ray, in his brief, also discusses Freiburger's testimony when recounting the evidence that he argues constituted a drumbeat repetition. Ray's argument, however, appears to be more that Freiburger was vouching for J.T. as a reliable witness in light of his reference to Indiana Trial Rule 704(b). We, therefore, will consider that argument below instead of considering Freiburger's testimony as part of the drumbeat repetition of J.T.'s allegations.

that Ray touched her vagina with his finger; (2) Officer Aguilar's testimony regarding J.T.'s statements, without objection from Ray; (3) Kellogg's testimony that J.T.'s chief complaint was that she was sexually assaulted; and (4) the admitted medical report from the Fort Wayne Sexual Assault Treatment Center, which contained J.T.'s statements regarding Ray's actions.

[17] In *Kress,* the defendant was charged with child molesting, and the eight-year-old child victim was the first witness to testify and to detail the defendant's actions. *Kress,* 133 N.E.3d at 745. Subsequent witnesses, including the child's mother, grandfather, and the investigating detective, all made reference to out-of-court statements by the child victim relaying the incidents of sexual abuse. The child victim's mother testified that she told police "what [the child victim] said"; the child victim's grandfather testified that, once the child disclosed the allegations to him, he asked the child to repeat the allegations to the child's mother and that the child's mother "needed to report this"; and the detective testified that he investigated an allegation of "child abuse" and conducted interviews accordingly. *Id.* at 746.

[18] Importantly, however,

> [The child victim] was the first witness to testify and was subjected to cross-examination. She gave specific, descriptive testimony about the touching. The subsequent witnesses gave only general testimony about the existence of allegations. No subsequent witness delved into [the child victim]'s version of events. Thus, unlike in other cases, here, the jury heard [the child victim]'s story just once.

*Id.* at 747-48. Our Court ultimately held that there was "no substantial likelihood that the challenged testimony contributed to the jury's decision to convict Kress." *Id.* at 748.

[19] Here, we do not find that the subsequent witnesses testimony constituted a drumbeat repetition of J.T.'s versions of events. Importantly, J.T. was the first witness to testify and gave "specific, descriptive testimony" about the day's events. *Kress,* 133 N.E.3d at 747; *see cf. Modesitt v. State,* 578 N.E.2d 649, 652 (Ind. 1991) (holding that "[b]ecause the trial court . . . allowed, over objection, the drumbeat repetition of the declarant's statements prior to the declarant's testifying and being subject to cross examination," the defendant's convictions should be reversed). J.T. was cross-examined regarding the veracity of her version of events before the other witnesses testified.

[20] Moreover, although Officer Aguilar gave some detail regarding J.T.'s allegations, Ray did not object during Officer Aguilar's testimony. Ray did object to Kellogg's statement that J.T. alleged she was "sexually assaulted"; however, Kellogg provided no other details regarding J.T.'s allegations and this statement alone can hardly be considered recounting J.T.'s allegations. Tr. Vol. IV p. 59. Finally, Ray objected to the admission of J.T.'s medical exam report because the report contained a narrative of J.T.'s allegations. Ray concedes in his brief that the medical records were admissible under the medical exception to the hearsay rule pursuant to Indiana Rule of Evidence 803(4); however, Ray argues that J.T.'s statement within the medical report was repetitive and cumulative. The narrative in the medical report, however, did not elaborate on

J.T.'s allegations more than necessary, but instead merely stated them for medical purposes.

[21] Based on the foregoing, we cannot find that the trial court abused its discretion in admitting the evidence from J.T., Officer Aguilar, Kellogg, and J.T.'s medical report from the Fort Wayne Sexual Assault Treatment Center.

### B. Did the evidence constitute vouching?

[22] Next, Ray argues that Freiburger's testimony constituted impermissible vouching testimony. Indiana Evidence Rule 704(b) provides that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." "Such vouching testimony is considered an invasion of the province of the jurors in determining what weight they should place upon a witness's testimony." *Alvarez-Madrigal v. State,* 71 N.E.3d 887, 892 (Ind. Ct. App. 2017) (citations omitted), *trans. denied.* "It is essential that the trier of fact determine the credibility of the witnesses and the weight of the evidence." *Carter v. State,* 31 N.E.3d 17, 29 (Ind. Ct. App. 2015) (citations omitted), *trans. denied.*

[23] Freiburger's specific comments described J.T. as articulate, confident, aware of her surroundings, able to retain information, and able to share that information with Freiburger. Freiburger also described J.T. as "helpful in an interview," which the trial court struck from the record. Tr. Vol. IV p. 99.

[24] In *Carter,* the child victim disclosed Carter's molestation, recanted the allegations, then again disclosed Carter's molestation. After an investigation of

the child victim's allegations and recantation, the defendant was charged with three counts of child molesting, Class A felonies; and two counts of child molesting, Class C felonies. *Carter,* 31 N.E.3d at 23. During the State's case-in-chief at Carter's trial, a forensic interviewer provided testimony "concerning the dynamics of child abuse, the disclosure process, and when and why a child may recant his disclosure of the abuse." *Id.* at 29.

[25] A panel of this court found that the forensic interviewer's testimony did not run afoul of Indiana Evidence Rule 704(b) because the forensic interviewer, who interviewed the child victim, "never mentioned [the child victim] in her testimony or made any statement of opinion regarding the truth of falsity of [the child victim]'s allegations of molestation" at the jury trial. *Carter,* 31 N.E.3d at 29. Moreover, the *Carter* witness "did not purport to have any opinion regarding the case at bar[;] nor did she refer to any specific facts at issue. Her testimony was broad, generalized, and included reference to results of research studies." *Id.*

[26] Here, in contrast to the witness in *Carter,* Freiburger's comments were specific to J.T., painted J.T. as aware of her surroundings, able to retain information well, confident, and articulate. Freiburger also testified that J.T. was able to correct Freiburger in recounting J.T.'s allegations, which is important for determining J.T.'s reliability.

[27] This testimony regarding J.T.'s characteristics constituted impermissible vouching testimony because it took away the jury's responsibility to determine

whether J.T.'s testimony was credible. Freiburger implied, in specifically describing J.T.'s qualities, that J.T. should be believed. Accordingly, the trial court abused its discretion in allowing Freiburger's impermissible vouching testimony.

### C. Was admission of the vouching evidence harmless error?

[28] The State argues that, even if admission of this vouching evidence was erroneous, any error was harmless. Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of the party. *Mendoza-Vargas v. State*, 974 N.E.2d 590, 597 (Ind. Ct. App. 2012). To determine whether an error in the introduction of evidence affected the appellant's substantial rights, we assess the probable impact of that evidence upon the jury.

[29] Substantial evidence, other than the vouching testimony, was submitted to the jury to support Ray's conviction and to support J.T.'s testimony, including: J.W.'s testimony of what she heard while Facetiming with J.T.; Thomas' testimony that she saw Ray holding J.T. in a headlock and that Ray ran away when he saw Thomas; the photographs that Thomas took of Ray; male DNA evidence that was detected in an internal genital swab of J.T.;[4] Ray's DNA that was found as part of a mixture of DNA from three individuals on the front

---

[4] J.T.'s female DNA "overwhelmed" the male DNA present; therefore, the male DNA was insufficient to determine a matching profile. Tr. Vol. IV p. 228.

waistband of J.T.'s underwear;[5] that a condom wrapper was found inside the shed J.T. described; and that Ray had grass on his bottom, underneath his clothes, which was consistent with J.T.'s account of Ray taking his pants off in the shed.

[30]     Accordingly, Freiburger's vouching testimony likely did not impact the jury because there was substantial evidence to support J.T.'s testimony and Ray's conviction. *See Wilkes v. State,* 7 N.E.3d 402, 406 (Ind. Ct. App. 2014) (finding that, "[i]n light of the other evidence in the record, the admission of [the] vouching testimony was harmless"); *see also Norris v. State,* 53 N.E.3d 512, 524 (Ind. Ct. App. 2017) (concluding "that the trial court's erroneous admission of the vouching testimony amounted to harmless error" in light of "substantial evidence" in the record). We find that any error in the admission of the evidence Ray challenges was harmless.

# Conclusion

[31]     The trial court did not abuse its discretion in admitting drumbeat repetition evidence. Although the trial court did abuse its discretion in allowing vouching testimony, any error in the admission of evidence was harmless. We affirm.

[32]     Affirmed.

---

[5] At trial, the State presented evidence that "[t]he DNA profile [from the waistband of J.T.'s underwear] is at least one trillion times more likely if it originated from J.T., [Ray], and an unknown individual rather than if it originated from J.T., and two (2) unknown unrelated individuals." Tr. Vol. IV p. 233.

Kirsch, J., and Pyle, J., concur.