

**FILED**

Feb 14 2020, 6:16 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Cody E. Reynolds,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 14, 2020

Court of Appeals Case No.
19A-CR-880

Appeal from the Allen Superior
Court

The Honorable David M. Zent,
Judge

Trial Court Cause No.
02D05-1710-F6-1115

**Darden, Senior Judge.**

# Statement of the Case

A jury found Cody E. Reynolds ("Cody") guilty of child molestation, a Level 4 felony;[1] and vicarious sexual gratification, a Level 6 felony.[2] Cody appeals the trial court's judgment of conviction for both offenses, and his sentence for child molestation. We affirm.

# Issues

Cody raises four issues, which we restate as:

> I. Whether the trial court erred in denying Cody's challenges for cause of two jurors.
>
> II. Whether the trial court erred in admitting into evidence a video recording of the child victim's forensic interview along with the child victim's trial testimony and live testimony by the interviewer.
>
> III. Whether the evidence is sufficient to sustain Cody's convictions.
>
> IV. Whether Cody's sentence for child molestation is inappropriate in light of the nature of the offense and the character of the offender.

---

[1] Ind. Code § 35-42-4-3 (2015).

[2] Ind. Code § 35-42-4-5 (2014).

## Facts and Procedural History

[3] Cody and Tricia Reynolds ("Tricia") married in 2014. Tricia had two daughters, H.W. and I.W., from a previous relationship. Cody and Tricia subsequently had a daughter together, R.R. At all times relevant to this case, primarily in the year 2017, H.W. was eight-going-on-nine years old, I.W. was seven years old, and R.R. was two-going-on-three years old. Tricia worked in a restaurant at night. Cody was employed during the day, and he watched all three girls when Tricia was at work and H.W. and I.W. were not at their father's house. H.W., Tricia, and Detective Lorrie Freiburger, a trained child forensic interviewer, all testified at Cody's trial.

[4] On one occasion in the spring of 2017, when Tricia came home from work, she found Cody in the living room asleep on the couch, with his shorts down around his ankles and a pillow covering the area of his groin. The girls were asleep in their rooms.

[5] According to the testimony of H.W., during this period of time, on one occasion when Tricia was at work, and the other girls were in their rooms, she related that she and Cody were together in the living room watching television. At some point, Cody pulled his pants down to his ankles, sat on the couch, and openly masturbated in H.W.'s presence. H.W. further testified that Cody squirted some lotion on his hand and rubbed "up and down" on his "private part." Tr. Vol. 3, p. 54. She looked away and was "kind of scared." *Id.* at 52. Cody told H.W. not to tell Tricia what he had done.

[6] H.W. later testified that Cody masturbated in front of her approximately twenty different times. Almost every time he masturbated in her presence, he would put some lotion from a particular bottle on his private part. Cody kept the bottle of lotion in a closet that the girls were not allowed to go into without Tricia or Cody's permission. On one specific occasion, when Cody was masturbating in H.W.'s presence, he ran out of lotion and ordered her to "spit on his hand." *Id.* at 54. She obeyed him, and he continued to masturbate.

[7] Cody also taught H.W. a "game" he called "the five finger challenge." *Id.* at 59. The "game" required one person to close their eyes and feel another person's hands to determine how many fingers the other person was holding up. During one incident, Cody told H.W. to close her eyes and reach toward his hands. H.W. felt what she thought was six fingers, but when she opened her eyes, she saw that she was feeling Cody's fingers and his "private part." *Id.* at 62. She described his "private part" as being "slimy." *Id.* at 63. Afterwards, H.W. went to her room.

[8] H.W. was disturbed and believed that Cody was doing something "wrong" because he had told her not to tell Tricia what he was doing. *Id.* at 69. As a result, she "looked it up" on a website and learned "that [what he was doing] wasn't okay." *Id.* On Thursday, August 3, 2017, while Cody was taking a shower, H.W. told Tricia what Cody had been doing with her. Tricia took the evening off from work, gathered the girls, and went to her aunt's house. Tricia told her aunt what H.W. had told her.

[9]     The next day, on Friday, it was R.R.'s birthday. Tricia and other family members had previously scheduled a surprise party for R.R. at a restaurant. Tricia took the girls to the party. She had not told Cody about the party, but he heard about it from another source and attended. After the party, Tricia called H.W.'s father and told him what had occurred. Tricia then went to her own father's house, put the girls to bed, and called the police.

[10]    Officer David Colon[3] arrived at Tricia's father's house around 1 a.m., and Tricia met him outside. She explained to him what H.W. had told her. Officer Colon prepared a report and called the Indiana Department of Child Services ("DCS"). A DCS employee called Tricia later that morning/day. Tricia and the DCS employee created a safety plan for the children, and scheduled an appointment for a forensic interview the following Monday.

[11]    In the meantime, Tricia had previously planned a family camping trip for that weekend. She took the girls on the trip without Cody. Tricia did not want to cancel the trip because she was concerned that H.W. would think she was being punished for disclosing what Cody had done to her. During the trip, H.W. also revealed to Tricia that Cody had tricked her into feeling his penis during what Cody called the "finger game," and explained to Tricia how the game was played. Tr. Vol. 3, p. 18.

---

[3] By the time Colon testified at trial, he had been promoted to detective.

[12] On Monday, August 7, Tricia took H.W. to the Dr. Bill Lewis Center for Children ("the Center") for a forensic interview. Freiburger spoke with H.W. while a DCS case manager, another detective, a prosecutor, and a representative of the prosecutor's victim's assistance office watched live video of the interview from another room. Freiburger wore a receiver in her ear so that the people remotely watching the interview could send her additional questions via a microphone. Tricia remained in the Center's reception area and did not participate in or observe the interview. A video camera was set up in the interview room.

[13] At the beginning of the interview, Freiburger disclosed to H.W. that she had a receiver in her ear and that their conversation was being video recorded. She then asked H.W. what had happened. H.W. told Freiburger that Cody had "masturbated" or "jerk[ed] off" in her presence. State's Ex. 4, at 5:41, 5:51. H.W. used the phrase "down there" to describe Cody's private parts. Tr. Vol. 3, p. 67. Next, Freiburger showed her a drawing of a nude man and asked her to point to what she meant by "down there." *Id.* H.W. pointed at the man's genitals, and Freiburger circled them.

[14] H.W. also told Freiburger that Cody had masturbated in her presence about "twenty" times. State's Ex. 4, at 7:00. She moved her hand up and down to demonstrate how Cody masturbated. H.W. said that on one occasion she saw a "clear" liquid come out of Cody's private part, and he cleaned it up with a napkin. Tr. Vol. 3, p. 58; State's Ex. 4, at 11:00. She also described and demonstrated the finger game to Freiburger. H.W. further told Freiburger that

Cody had her play the game and, when she opened her eyes, she saw that she was feeling his private part. In addition, H.W. drew a picture of Cody's bottle of lotion.

[15] After the interview, the interview team met with Tricia to establish a plan to protect the girls. Next, a DCS case manager went to the location where Tricia and the girls were staying to ensure that the girls were safe and that their needs were being met.

[16] H.W. was subsequently diagnosed with post-traumatic stress disorder. Tricia explained that H.W. was having trouble sleeping and was waking up due to nightmares. Even a hug could provoke feelings of anxiety in her. H.W. was displaying hostility, anger, irritability, and fear, which was damaging her relationships with her family. She was going to therapy every other week and seeing a life skills coach six times per month.

[17] On October 2, 2017, the State charged Cody with vicarious sexual gratification, a Level 6 felony. On September 5, 2018, the State filed a notice indicating it intended to use the statements of a protected person at trial. Specifically, the State intended to introduce into evidence statements H.W. made to Freiburger during the forensic interview. The trial court held an evidentiary hearing on September 28, 2018, during which Freiburger testified, and the recording of the interview was played. On October 1, 2018, the trial court issued an order stating:

1. The witness, H.W., is a protected person under the statute and was present for the hearing and available for cross examination.

2. The Statement given by H.W. to Lorrie Freiburger concerns the charges filed against [Cody].

3. The Forensic Interviewer asked open-ended, non-leading questions which were age-appropriate.

4. The Statement, as contained in State's Exhibit 1 [the recording of the interview] would be admissible in the trial of this cause as it is probative and relevant. The witness, H.W., was reserved but open to the questions and oftentimes she corrected the Interviewer. H.W. volunteered information and provided detailed descriptions.

The Court finds the statements to the Forensic Interviewer to be sufficiently reliable to be admitted into evidence.

Appellant's App. Vol. II, pp. 53-54.

[18] On October 9, 2018, the State filed a motion to amend the charging information to add a second count, child molesting as a Level 4 felony. The trial court granted the motion after a hearing.

[19] The trial judge presided over a jury trial on February 12 and 13, 2019. H.W. and other witnesses, including Freiburger, testified for the State. In addition, the trial court admitted into evidence the video recording of H.W.'s forensic interview with Freiburger. The jury found Cody guilty as charged. At the end of the trial, the trial court issued a judgment of conviction on the jury's verdict.

On March 22, 2019, the trial court imposed an aggregate sentence of thirteen years and 183 days, with two years and 183 days suspended to probation. This appeal followed.

# Discussion and Decision

## I. Challenges for Cause of Potential Jurors

Cody argues the trial court erred in denying his challenges for cause of multiple potential jurors, claiming he had demonstrated that they were biased against him. The State responds that only two of the challenged potential jurors were ultimately seated in the jury, and they both demonstrated they could be fair and impartial.

The purpose of the jury selection process is to ascertain whether prospective jurors can render an impartial verdict based on the law and the evidence. *Gibson v. State*, 43 N.E.3d 231, 238 (Ind. 2015). Parties may ask questions of prospective jurors "to discover prejudice and eliminate bias." *Skaggs v. State*, 438 N.E.2d 301, 304 (Ind. Ct. App. 1982).

Indiana Jury Rule 18 establishes that parties may use peremptory challenges for any reason to remove potential jurors from the jury pool.[4] In addition, the

---

[4] A peremptory challenge occurs when a party strikes a potential juror other than for cause. Such challenges are intended "to eliminate extremes of partiality and to assure the parties that jurors will decide the issues on the basis of the evidence before them." *Phillips v. State*, 496 N.E.2d 87, 88 (Ind. 1986). A peremptory challenge is exercised "without reason stated, without inquiry, and without being subject to the [trial] court's control." *Id.* In felony cases where the State seeks neither the death penalty nor life without parole, each party is entitled to ten peremptory challenges. Ind. Jury Rule 18(a)(2).

Sixth Amendment requires that "biased jurors be removed for cause." *Whiting v. State*, 969 N.E.2d 24, 29 (Ind. 2012). However, there are no limits on the number of challenges for cause, but each challenge must be supported by specified causes or reasons that demonstrate that, as a matter of law, the potential juror is not qualified to serve. *Id.* (quotation omitted).

[24] The Indiana Supreme Court has further stated:

> [T]he trial judge has the inherent authority and responsibility to dismiss biased jurors for cause, either sua sponte or upon counsel's motion, and is afforded broad discretion in making these decisions; and on appeal, we afford substantial deference to the trial judge's decision respecting a challenge for cause and will find error only if the decision is illogical or arbitrary.

*Id.* As we conduct our review, we keep in mind that the trial court is in the best position to "assess the demeanor of prospective jurors as they answer the questions posed by counsel." *Smith v. State*, 730 N.E.2d 705, 708 (Ind. 2000).

[25] In Cody's case, the trial court and counsel went through three rounds of questioning to select the twelve-person jury and two alternates. Here, defendant's argument and challenge appears to focus on the third round, at which point the trial judge needed only four more jurors to complete the jury selection process. During the third round, the prosecutor asked the potential jurors what they thought about the State putting children on the witness stand.

Several potential jurors, including numbers 133 and 72,[5] indicated they understood that testimony by child witnesses was sometimes necessary. Cody, by counsel, engaged in the following colloquy with the potential jurors:

> Q: Good afternoon. Um, I was listening to some of the answers and I used to ask this beforehand but I didn't today. But I'm gonna ask you now. Um, it's not a popularity contest. If you like [the prosecutors] better than me, well I can live with that. But don't vote in favor or against my client because I was a little aggressive in my questioning of someone. You can hate me, it doesn't - I mean no one likes to be hated, but I can live with it because I'm doing my job. And if you don't like my style don't hold it against my client, is that fair enough? Number [94]?
>
> JUROR 94: Yes, I think that's fair. But I - I just don't want it to be an overly aggressive examination of the child. Uh, that's my only qualm about the whole situation.
>
> Q: And I don't like people who lie.
>
> JUROR 94: I'm sorry?
>
> Q: And I don't like people who lie.
>
> JUROR 94: It's a child who is under oath.
>
> Q: And I – I - well it happens. I'm just saying, you know, we have to take our job seriously, and I do. I'm not saying that no one else does, but, I like to get to the meat of the issues. And if it offends you, is that gonna affect your being able to be impartial I guess?
>
> JUROR 133: Uh, I would say yeah.

---

[5] The potential jurors each received jury numbers, apparently based on their questionnaires. During the jury selection process, the parties addressed the jurors based on their seat number in the jury box, but the transcript identifies them by their juror numbers. We refer to potential jurors using their juror numbers.

Q:      Okay.  How about you?

JUROR 94:  I do believe that if you took an overly aggressive cross examination of a child witness I would - I would view that unfavorably in your case.  Now, an adult is a different story.

Q:      Okay, that - but that's fair.  Anybody else?  Number [72]?

JUROR 72:  I actually agree with number [94].

Q:      Okay.

JUROR 62:  Umhuh (affirmative response), me too.

Q:      Number [62], okay.  Number [140]?

JUROR 140:  I agree with 3.

Q:      Okay, number [8]?  I didn't mean to cross over you.

JUROR 8:   Um, well, uh, if - if you weren't to exercise your due diligence in handling that situation I might think less of you.  But, um, I would do my best to remain impartial as to, uh, assessing the evidence.

Q:      Do you think it could affect you though?

JUROR 8:   Do I think it could affect me?

Q:      Affect your impartiality?

JUROR 8:   Um, my hope would be no.

Q:      Yeah, but hope is not a yes or no?

JUROR 8:   Some people are too certain of their own knowledge.

Q:      Well I understand that.  I'm not trying to argue with you.

JUROR 8:   I understand.

Q:      We're just looking for fair and impartial jurors.

JUROR 8:   No, I'm enjoying this too.

Q:      Okay, I'm glad you are but can you be fair and impartial?

JUROR 8:   Yeah, I believe so.

Q:      You believe or - yes or no.  I mean, again, you might even - if you're selected you might hear either the State or me say Judge could you please direct the witness to just answer the question with a yes or a no.

JUROR 8:   Oh, yeah.  No, that's fair.

Q:      Okay, so yes or no, can you be fair and impartial?

JUROR 8:   Yes.

Q:      Okay.  Number [32]?

JUROR 32:  Yes.

Q:      Okay, um, number [140], sorry.

JUROR 140:      Yeah, I think I can be fair and impartial.

Q:      Okay.  How about -

JUROR 140:      I'm a teacher.

Q:      [137]?

JUROR 137:      Yes.

Q:      Okay, [43]?

JUROR 43:  Yes.

Q:      Number [53]?

JUROR 53: Yes.

Tr. Vol. 2, pp. 203-06.

[26]     After Cody finished questioning the potential jurors, the parties approached the bench to discuss challenges for cause. Cody strenuously objected and challenged for cause the potential jurors in seats one through eight, including potential jurors 72 and 133, claiming they had all agreed that they could not be fair if Cody was "overly aggressive" during witness questioning. *Id.* at 213. He repeatedly indicated that no one knows how those potential jurors define "aggressiveness." *Id.* After further discussion, the trial court struck potential juror 94 but denied Cody's request to strike the others, stating, "I'm not gonna strike seven (7) people for cause because of the civility issue." *Id.* at 214. Cody had already exhausted his peremptory challenges. After the bench conference concluded, the trial court notified four remaining potential jurors that they had been selected for the jury, concluding the selection process.

[27]     Cody claims the trial court committed reversible error and should have struck for cause all of the potential jurors he identified. The State notes, without contradiction, that potential jurors 72 and 133 were the only potential jurors Cody specifically challenged in round three that were ultimately seated on the jury. Cody does not explain in his briefs how he was harmed by the trial court's refusal to strike the other potential jurors that were not seated on the jury, so we will restrict our analysis to potential jurors 72 and 133.

[28]     Cody argued in the trial court, and argues on appeal, that it was "illogical and arbitrary" for the trial court to grant his challenge as to potential juror 94 but not the remaining jurors, because they all demonstrated they had the same bias. Appellant's Br. p. 29. We disagree. To begin with, Cody expressed concern to the trial court that the potential jurors had not explained what they meant by "aggressiveness," but he had begun his third round of questions by using the word "aggressive" without himself providing an explanation of that term or requesting a definition from the trial court. He thus invited any confusion concerning the usage of the term.

[29]     Next, the record does not definitively demonstrate that potential juror 72 displayed bias against Cody. Potential juror 72's response could be construed as agreeing with potential juror 94 that it was "fair" to not hold any dislike of Cody's trial counsel against Cody himself, but expressing a "qualm" about "overly aggressive" questioning of a child witness and viewing it "unfavorably." Tr. Vol. 2, pp. 203-04. Further, potential juror 72 had earlier acknowledged it was his or her understanding that sometimes it was necessary to have a child testify in a trial. Those equivocal responsive statements do not amount to proof of bias against Cody. At best, they appear to indicate potential concern for Cody's trial counsel's litigation style, as noted by the trial judge. *See Oswalt v. State*, 19 N.E.3d 241, 250 (Ind. 2014) (affirming denial of challenge of potential juror for cause; potential juror expressed "discomfort" at trying child molestation case, but discomfort did not amount to bias or prejudice).

[30]     Next, Cody's counsel asked potential juror 133 whether that person's impartiality would be affected if that person was offended by counsel's preference to "get to the meat of the issues." Potential juror 133 responded, "I would say yeah." Tr. Vol. 2, p. 204. Thus, the juror provided an equivocal answer to a vague question. Cody's counsel did not define what he meant by addressing "the meat of the issues," and his question about impartiality was conditioned on whether the juror would be "offend[ed]." *Id.* The question was so unclear that potential juror 133 reasonably could have concluded that counsel was again asking whether the juror would dislike counsel, rather than whether he or she would be biased against Cody, if counsel questioned witnesses aggressively. We further note that potential juror 133 had also earlier indicated he or she understood that sometimes it was necessary for children to testify at trial. Under these circumstances, we should rely on the trial judge, who was in the best position to assess potential juror 133's demeanor and reactions to counsel's questions.

[31]     In any event, the transcript of counsel's cross-examination of H.W. and the State's other witnesses reveals what appears to be normal cross-examination, and counsel did not object to the trial court at any point during the trial that he was limited or hampered in any manner during questioning. Cody has failed to demonstrate an abuse of discretion. *See Oswalt*, 19 N.E.3d at 251 (deferring to trial court's ability to assess demeanor of potential juror).

# II. Admissibility of Forensic Interview and Interviewer's Testimony

[32] Cody asserts that the trial court erred in admitting into evidence both the recording of Freiburger's forensic interview with H.W. and Freiburger's testimony about the interview, claiming the trial court violated the Indiana Supreme Court's decision in *Tyler v. State*, 903 N.E.2d 463 (Ind. 2009).[6] The State argues that Cody waived his challenge to the admissibility of Freiburger's testimony. After reviewing the record, we disagree. We will address the admissibility of both the recorded interview and Freiburger's testimony.

[33] "In general, the decision to admit or exclude evidence is within a trial court's sound discretion and is afforded great deference on appeal." *Agilera v. State*, 862 N.E.2d 298, 302 (Ind. Ct. App. 2007), *trans. denied*. We review evidentiary rulings solely for an abuse of discretion, which "occurs where the decision is clearly against the logic and effect of the facts and circumstances before the court." *Carter v. State*, 31 N.E.3d 17, 28 (Ind. Ct. App. 2015), *trans. denied*.

[34] Indiana Code section 35-37-4-6 (2016), which is also known as the protected person statute ("PPS"), governs the admissibility at trial of prior statements by protected persons in certain circumstances. The PPS applies to specific crimes,

---

[6] Cody also claims in passing that the admission of this evidence violated his federal and state constitutional right to a fair trial. But he mentions those provisions only in the context of discussing the *Tyler* case, and he does not present any separate constitutional analysis. We deem Cody's constitutional claims to be waived. *See* Ind. Appellate Rule 46(A)(8)(a) (each contention must be supported by citations to authorities and by cogent reasoning).

including the convictions at issue in this case. In addition, the PPS defines a protected person, in relevant part, as "a child who is less than fourteen (14) years of age." *Id.* There is no dispute that H.W. meets the definition of a protected person under the PPS.

[35] The PPS further provides, in relevant part:

> A statement or videotape that:
>
> (1) is made by a person who at the time of trial is a protected person;
>
> (2) concerns an act that is a material element of an offense listed in subsection (a) or (b) that was allegedly committed against the person; and
>
> (3) is not otherwise admissible in evidence;
>
> is admissible in evidence in a criminal action for an offense listed in subsection (a) or (b) if the requirements of subsection (e) are met.

Ind. Code § 35-37-4-6(d).

[36] The requirements of subsection (e) of the PPS include a hearing outside the presence of the jury, with advance notice to the defendant, after which the trial court shall determine "that the time, content, and circumstances of the statement or videotape provide sufficient indications of reliability." Ind. Code § 35-37-4-6(e). In this case, the trial court held a hearing prior to trial and

determined H.W.'s prior statement was admissible. Cody does not present any claims of error arising from the pretrial hearing. Another relevant requirement of Indiana Code section 35-37-4-6(e) is that the protected person must testify at trial or be found unavailable to testify for specific reasons not relevant here.

[37] Although the PPS explicitly indicates that both a protected person's live testimony and prior statement may be introduced at trial, Cody argues that it is inappropriate to admit H.W.'s live testimony, along with the recording of H.W.'s interview and Freiburger's testimony, citing *Tyler v. State.* In that case, Tyler was accused of sexual misconduct involving five children he was babysitting. The five children subsequently participated in separate recorded interviews. At trial, all five children testified, and three of the children's videotaped interviews were admitted into evidence under the PPS.

[38] Tyler argued to the Indiana Supreme Court that the trial court erred in admitting the interviews along with the children's live testimony. The Supreme Court noted that Indiana Code section 35-37-4-6 "represents a departure from ordinary trial procedure," "and should be used only when necessary to further its basic purpose of avoiding further injury to the protected person." 903 N.E.2d at 466. Nevertheless, the Supreme Court recognized that the PPS is "a part of Indiana evidence law, though not in the Rules." *Id.* at 467.

[39] Considering the purposes of the PPS and the potential harm resulting from the admission of duplicative evidence, the Supreme Court determined: "We hold that if the statements are consistent and both are otherwise admissible,

testimony of a protected person may be presented in open court or by prerecorded statement through the PPS, but not both except as authorized under the Rules of Evidence." *Id.* The Supreme Court also noted: "[t]here are . . . some circumstances under which a prior statement of a live witness is admissible under the Rules of Evidence, for example under Evidence Rule 801(d)(1)(A) or (B) because it contains inconsistent statements or rebuts a claim of fabrication. But neither party claims that the testimony in this case is admissible under these provisions." *Id.* at 466. The Supreme Court ultimately concluded that although the videotaped statements should not have been admitted as they were further cumulative of the victims' trial testimony, the prejudicial effect was "not significant" and did not require reversal. *Id.* at 467.

[40]  We turn to the recording of H.W.'s forensic interview. The State argues that the trial court did not err in admitting the recording along with H.W.'s live testimony because the Indiana Rules of Evidence authorized the admission. We disagree. The State, citing to Indiana Evidence Rule 801(d), claims the recorded statement was admissible to refute Cody's claims that H.W. had fabricated her allegations. That rule provides, in relevant part:

> (d) Statements That Are Not Hearsay. A statement that meets the following conditions is not hearsay:

> (1) A Declarant-Witness's Prior Statement. The declarant testifies and is subject to cross-examination about a prior statement, and the statement:

> \* \* \* \* \*

(B) is consistent with the declarant's testimony and is offered:

(i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or

(ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground . . . .

*Id.*

[41] To be admissible as substantive evidence, the prior consistent statement must have been made "'before the motive to fabricate arose.'" *Moreland v. State*, 701 N.E.2d 288, 293 (Ind. Ct. App. 1998) (quoting 13 Robert L. Miller, Jr., Indiana Evidence § 613.208 (1995)). In this case, Cody told the jury during his opening statement that H.W. first raised her allegations the night after Cody told Tricia "I am not gonna stay with you anymore." Tr. Vol. 2, p. 233. He thus indicated that H.W. was prompted by her mother to fabricate the allegations of molestation from the beginning, and there is no evidence that disputes the timing of Cody's request for a divorce. As a result, H.W.'s statements during the recorded forensic interview were made after the alleged motive to fabricate arose. *See Lovitt v. State*, 915 N.E.2d 1040, 1044 (Ind. Ct. App. 2009) (no error in excluding prior consistent statement; witness already had motive to fabricate when she made the statement). In light of this argument, Indiana Evidence Rule 801(d) alone does not justify the admission of H.W.'s recorded forensic interview.

[42] The State further argues that the recorded forensic interview was admissible under the holding in *Evans v. State*, 643 N.E.2d 877 (Ind. 1994). In that case, the trial court allowed the State to admit into evidence a witness's transcribed police statement and deposition. On appeal, Evans argued the statement and deposition were inadmissible prior statements, but the Indiana Supreme Court concluded they were "admissible under the doctrine of completeness." *Id.* at 881. The Court noted, "a party may place the remainder of a statement or document before the jury after the opposing party has introduced a portion of that statement or document into evidence." *Id.*

[43] In the current case, Cody did not put a portion of H.W.'s forensic interview into evidence before the State sought to introduce the entire interview. The doctrine of completeness is inapplicable here, and *Evans* is distinguishable.

[44] To summarize, the Rules of Evidence do not otherwise support the admission of the recorded forensic interview into evidence, and admission of the recording into evidence along with H.W.'s live testimony contravenes the Indiana Supreme Court's holding in *Tyler*. But our analysis does not end there. The admission of evidence is subject to a harmless error analysis. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *trans. denied*. Admission of a recording may be harmless error if it is no more than cumulative of the statements of a witness and the recording is not the only direct evidence of the events. *Id.*

[45] A panel of our Court found harmful error in *Cox v. State,* 937 N.E.2d 874, 879 (Ind. Ct. App. 2010), *trans. denied,* when the trial court admitted both the video interview and the child's live testimony. We held:

> We note that in *Tyler,* the court concluded that introduction of the prerecorded statements into evidence was not reversible error because it was merely cumulative of the children's consistent trial testimony. Here, there was no trial testimony by D.H. regarding the charged crimes, consistent or otherwise. All of the evidence supporting Cox's convictions came from the videotaped statement. Introduction of that statement removed any possibility that D.H. might make inconsistent statements in live testimony as compared to the statement, and so that potential avenue for defense counsel to attack the veracity of D.H.'s claims was foreclosed. Additionally, we note that the statement was not made under any kind of oath, including an oath appropriate for children. There was, for example, no examination *before* D.H. gave the statement of whether he appreciated the difference between truths and lies. Thus, there is no sworn testimony or statement supporting Cox's convictions. The trial court's erroneous admission of the videotape cannot be labeled harmless.

*Cox,* 937 N.E.2d at 879 (citations omitted and emphasis supplied).

[46] The facts of this case, however, are more similar to *Tyler* than *Cox.* In this case, the recorded interview was merely cumulative of in-court testimony by H.W. and Tricia. Further, Tricia's testimony added another piece of circumstantial evidence: during the relevant time period, she came home from work and found Cody asleep on the couch with his pants down around his ankles, with a pillow covering his genitals. We therefore conclude, as did our Supreme Court, that the effect of the admission of the recorded interview herein was

"insignificant" and we do not find it amounted to reversible error. *See Tyler,* 903 N.E.2d at 467 (no reversible error in admission of recorded interviews; any prejudicial effect was outweighed by the children's live testimony); *see also Taylor v. State*, 841 N.E.2d 631, 637 (Ind. Ct. App. 2006) (admission of recorded forensic interview was harmless error; victim, the victim's mother, and the forensic interviewer testified at trial), *trans. denied*.

[47] Turning to Freiburger's testimony, we note that the Indiana Supreme Court's holding in *Tyler* is limited to situations involving "testimony of a protected person . . . in open court or by prerecorded statement." 903 N.E.2d at 467. As a result, the holding does not apply to Freiburger's live testimony. We instead turn to *Taylor*, in which Taylor challenged the admissibility of several pieces of evidence, including a forensic interviewer's testimony regarding statements made by the child victim during the interview. 841 N.E.2d at 633. A panel of this Court determined the trial court did not abuse its discretion in admitting testimony by the interviewer, noting: (1) the forensic interview occurred four days after the initial disclosure; (2) the interview lasted twenty minutes; (3) the interviewer did not ask leading questions, and the victim's mother was not present; and (4) the interview occurred before a sexual assault examination.

[48] Here, Freiburger interviewed H.W. four days after she disclosed the sexual abuse to her mother. The interview lasted only thirty minutes. Tricia did not participate in or observe the interview. Freiburger testified that her interview protocol requires letting the child lead the interview and avoiding direct questions. She further explained that she followed the above protocol by

allowing H.W. to narrate what happened and expressed no credibility as to H.W.'s statements made during or after the interview. Finally, the record fails to indicate whether H.W. underwent a sexual assault examination, and whether it happened before her forensic interview. Under the circumstances, and following the holding in *Taylor*, we conclude the trial court did not abuse its discretion in admitting Freiburger's testimony concerning the forensic interview.

## III. Sufficiency of the Evidence

Cody argues the State failed to present sufficient evidence to sustain his convictions, in large part because he claims H.W.'s testimony was incredibly dubious and unbelievable. The State responds that H.W.'s testimony was consistent and believable, and that the record contains ample evidence to affirm Cody's convictions.

The Indiana Supreme Court has explained:

> In reviewing a sufficiency of the evidence claim, the Court neither reweighs the evidence nor assesses the credibility of the witnesses. We look to the evidence most favorable to the verdict and reasonable inferences drawn therefrom. We will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt.
>
> Within the narrow limits of the 'incredible dubiosity' rule, a court may impinge upon a jury's function to judge the credibility of a witness. If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. This is

> appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

*Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002) (citations omitted). The rule applies only when a witness contradicts herself or himself in a single statement or while testifying, and does not apply to conflicts between multiple statements. *Carter*, 31 N.E.3d at 31.

[51] To convict Cody of Level 4 child molesting as charged, the State was required to prove beyond a reasonable doubt that he: (1) being at least eighteen years of age (2) performed or submitted to any fondling or touching (3) of either H.W. (a child under fourteen years of age) or himself (4) with the intent to arouse or to satisfy the sexual desires of H.W. or himself. Ind. Code § 35-42-4-3; Appellant's App. Vol. II, p. 62. To convict Cody of Level 6 vicarious sexual gratification as charged, the State was required to prove beyond a reasonable doubt that he: (1) being at least eighteen years of age (2) knowingly or intentionally (3) touched or fondled his own body (4) in the presence of H.W. (5) a child less than fourteen years of age (6) with the intent to arouse or satisfy the sexual desires of himself or H.W. Ind. Code § 35-42-4-5; Appellant's App. Vol. II, p. 17.

[52] Having reviewed the record, we reject Cody's claim that H.W.'s trial testimony was incredibly dubious. Her testimony was detailed and organized. Further,

H.W. did not equivocate, and her description of events was not improbable or illogical. *See Reyburn v. State*, 737 N.E.2d 1169, 1171-72 (Ind. Ct. App. 2000) (child-victims' testimony not incredibly dubious; both victims testified unequivocally and without contradiction about Reyburn's criminal misconduct toward them). Cody argues H.W.'s testimony is "inherently contradictory" to other evidence, Appellant's Br. p. 32, but the incredible dubiosity analysis focuses on contradictions within a witness's testimony, not in the context of other evidence.

[53] Next, the evidence is sufficient to sustain Cody's convictions. H.W. testified that Cody openly masturbated in her presence, explaining that he used lotion and sat on the couch in the living room with his pants down around his ankles. During the forensic interview, she demonstrated for Freiburger how Cody moved his hand on his penis as he masturbated. H.W. also described with particularity Cody's lotion bottle. Subsequently, the bottle was found inside the house, in a closet which the girls were not allowed to access without permission. This is sufficient evidence to sustain Cody's conviction for vicarious sexual gratification.

[54] H.W. further testified that Cody taught her a "game" in which one person would close their eyes and touch the other person's hands to determine how many fingers the other person was holding up. She explained that on one occasion while playing the game with Cody, when no one else was present, she initially thought she was touching Cody's fingers. However, when H.W. opened her eyes, she was surprised to learn that she was feeling his private part,

which she described as being "slimy." Tr. Vol. 3, pp. 62-63. This is sufficient evidence to sustain Cody's conviction for Level 4 felony child molesting.

[55] Cody argues H.W. had ample grounds to fabricate the claims against him, pointing to his own testimony that he had asked Tricia for a divorce on August 2, 2017, the day before H.W. first disclosed Cody's alleged sexual misconduct to Tricia. He also notes that he attended R.R.'s birthday party the day after H.W.'s disclosure, without incident. Cody further claims that H.W. did not divulge the alleged act of molestation (that is, Cody tricking H.W. into touching his penis) until she was on a camping trip with her mother, and that Tricia delayed calling the police for two days. Next, Cody claims H.W.'s allegations are improbable because: (1) she frequently stayed at her father's house during the period of time when the sexual misconduct was alleged to have occurred; (2) it was difficult to keep the other girls in their rooms; and (3) Tricia had installed a camera in the kitchen which she could access remotely via her telephone. These arguments all amount to a request for this Court to reweigh the evidence, which contradicts our standard of review. Cody presented all of these arguments to the jury, which was in the position to assess the witnesses' credibility accordingly. Cody has failed to demonstrate that the evidence is insufficient.

## IV. Appropriateness of Sentence for Child Molesting

[56] Cody argues that his eleven-year sentence, with two years suspended, for Level 4 felony child molesting is inappropriate in light of the nature of the offense and his character. He asks the Court to reduce his sentence to six years, with no

more than three years executed, to be served concurrently with his sentence for vicarious sexual gratification.

[57] Article seven, section six of the Indiana Constitution authorizes this Court to review and revise sentences "to the extent provided by rule." This constitutional authority is implemented through Appellate Rule 7(B), which provides that this Court may revise a sentence otherwise authorized by statute "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."

[58] A defendant must persuade the appellate court that his or her sentence has met this inappropriateness standard of review. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether a sentence should be deemed inappropriate turns on our sense of culpability of the defendant, the severity of the crime, the damage done to others, and other factors. *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). In particular, we may consider "whether a portion of the sentence is ordered suspended or is otherwise fashioned using any of the variety of sentencing tools available to the trial judge." *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010).

[59] "[W]e must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Stewart v. State*, 866 N.E.2d 858, 866 (Ind.

Ct. App. 2007). Deference to the sentencing decision "should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[60] To assess whether a sentence is inappropriate, we look first to the statutory range established for the class of the offense. At the time Cody committed child molesting, by statute the possible sentencing range for a Level 4 felony was imprisonment for a fixed term of between two and twelve years, with the advisory sentence being six years. Ind. Code § 35-50-2-5.5 (2014). The trial court sentenced Cody to eleven years, with two years suspended to probation, for an executed sentence of nine years, halfway between the advisory sentence and the maximum possible sentence.

[61] For purposes of sentencing revision, we first address the nature of the offense as related to child molesting. Cody acknowledges that his behavior was "grotesque and reprehensible" but urges the Court to consider that the specific offense was "a one time act of very short duration." Appellant's Br. p. 35. While the criminal act of child molesting as a Level 4 felony may have occurred over a short span of time, however, the evidence established that his act was part of a months-long series of prior acts of sexual misconduct he committed against H.W. Cody had ample opportunity to reconsider his criminal conduct but chose to continue. Further, his acts escalated in severity over time, from masturbating in H.W.'s presence, to ordering her to spit on his hand while

masturbating, to committing Level 4 felony child molesting by tricking her into feeling his penis.

[62] Further, H.W. was eight years old when the offenses occurred, which is well below the statutory limit of fourteen years. Also, Cody, as her stepfather and adult resident of the household, as well as her frequent caregiver, was in a position of trust over H.W.

[63] In addition, Cody's criminal behavior has had a severe impact on H.W. She has been diagnosed with post-traumatic stress disorder and regularly sees a therapist and a life skills coach. H.W.'s relationship with family members has been damaged to the extent that she presently displays a great amount of hostility, anger, irritability, and fear. Further, H.W.'s mother informed the court that she was concerned that Cody's abuse of H.W. would make her journey through adolescence even more turbulent than usual. There is nothing about the nature of his criminal behavior, and the consequences thereof, that convinces the Court that Cody's sentence is inappropriate.

[64] As for the character of the offender, Cody was twenty-nine years old at the time of sentencing. His prior criminal history consists of a felony theft conviction and misdemeanor convictions for possession of marijuana; two disorderly conduct convictions; criminal damage; unauthorized use of a motor vehicle; domestic violence; and, possession of paraphernalia. It appears that Cody has accrued new convictions every few years, demonstrating a consistent refusal to live a law-abiding life. Further, as noted, his Level 4 felony conviction of child

molesting was part of a series of other uncharged criminal behavior, because there was testimony that he masturbated in H.W.'s presence approximately twenty times but was charged for only one of those incidents.

[65] In mitigation, Cody asserts that he has a steady employment history, from 2012 until his arrest in this case. "[M]any people are gainfully employed such that this would not require" employment being noted as a mitigating factor. *Newsome v. State*, 797 N.E.2d 293, 301 (Ind. Ct. App. 2003), *trans. denied*. In addition, Cody accrued four of his misdemeanor convictions during that same period of time.

[66] Cody further claims that lengthy incarceration will pose a financial hardship to his daughter R.R. "[J]ail is always a hardship on dependents." *Teeters v. State, 817 N.E.2d 275, 280 (Ind. Ct. App. 2004)*, *trans. denied*. The record reflects that Tricia has had custody of R.R. since she and Cody separated, and as a result Cody has failed to show how R.R. will suffer undue hardship from his incarceration.[7] There is nothing about his character that renders his sentence inappropriate.

[67] Cody has failed to carry his burden of proving that his sentence for child molesting is inappropriate in light of the nature of the offense and his character.

---

[7] A reduction in household income may or may not create an undue hardship. On the other hand, the protection of minor siblings by parents and society is a factor that the trial court and this Court must consider and balance.

# Conclusion

[68] For the reasons stated above, we affirm the judgment of the trial court.

[69] Affirmed.

Brown, J., and Tavitas, J., concur.