

FILED

Jul 17 2023, 8:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Andrew J. Baldwin
Baldwin Perry & Kamish, P.C.
Franklin, Indiana

Michael R. Auger
Franklin, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

J.T. Whitehead
Steven J. Hosler
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Darius Jordan Birk,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | July 17, 2023<br><br>Court of Appeals Case No.<br>22A-CR-1133<br><br>Appeal from the<br>Johnson Superior Court<br><br>The Honorable<br>Peter D. Nugent, Judge<br><br>Trial Court Cause No.<br>41D02-2104-F3-27 |

**Opinion by Judge Foley**
Judges Bailey and May concur.

**Foley, Judge.**

[1] Darius Jordan Birk ("Birk") appeals his conviction, after a jury trial, of Level 3 felony aggravated battery causing serious permanent disfigurement,[1] Level 6 felony pointing a firearm at another,[2] Class A misdemeanor carrying a handgun without a license,[3] and Level 1 felony attempted murder.[4] Birk raises two issues for our review: (1) whether the trial court violated his Sixth Amendment right to confront and cross-examine certain witnesses; and (2) whether the trial court's jury instruction regarding "intent" was misleading, prejudicial, and impermissibly relieved the State from its burden of proof. Finding no Sixth Amendment violation and the jury instruction proper, we affirm.

## Facts and Procedural History[5]

[2] Sabrina Reynolds ("Reynolds")—along with her two children—lived in a townhouse provided to her by her father, Mark Reynolds ("Mark").[6] For years, Reynolds was in an on-again and off-again relationship with Jason Monroe ("Monroe"), the de facto father of both of her children.[7] Around Christmas time in 2020, Reynolds met Birk through mutual friends, and the two became

---

[1] Ind. Code § 35-42-2-1.5(1).

[2] I.C. § 35-47-4-3(b).

[3] I.C. § 35-47-2-1(a)(2017), amended by Pub. L. No. 175-2022, § 8 (eff. July 1, 2022).

[4] I.C. §§ 35-42-1-1, 35-41-5-1.

[5] We held an oral argument on May 18, 2023, at Martinsville High School. We thank the parties and the school for their participation.

[6] Sabrina and Mark share the same last name: Reynolds. To avoid confusion, we identify Mark by his first name.

[7] Monroe is the biological father of Reynolds's youngest child.

friends then started dating. Shortly thereafter, Birk moved his clothes and other belongings into the townhouse. On March 13, 2021, Birk and Reynolds got into an argument about Reynolds's stimulus money. Birk wanted to use the money to purchase a gun. Reynolds wanted to use the money for the downpayment on her own apartment so that she could move out of Mark's townhouse.

[3] The argument progressed, and Reynolds decided to take Birk to his mother's ("Sheila") house.[8] Reynolds drove her van, and Birk sat in the front passenger seat. The argument escalated. As Reynolds entered Sheila's neighborhood, Reynolds screamed for Birk to "get the fuck out of [her] car[,]" but Birk refused to do so. Tr. Vol. 4 pp. 30–31. Birk then pulled his gun out, cocked it, and pointed it at Reynolds, telling her "I should shoot you[.]" *Id.* at 33, 37. Reynolds replied: "[T]hen fucking shoot me." *Id.* Birk then shot Reynolds in the face. Reynolds got out of the van, and Birk ran after her, grabbed her, and put her in the backseat of the van while calling her a "stupid bitch." *Id.* at 38. A bystander testified that Birk stated "I'm sorry, baby, I'm sorry" when he grabbed Reynolds and put her back in the van. Tr. Vol. 3 p. 194. Another bystander testified that when Birk got out of the van, she heard Birk screaming "call [ ] 911." *Id.* at 181. Once Birk put Reynolds in the van, he quickly drove

---

[8] Darius and Sheila share the same last name: Birk. To avoid confusion, we identify Sheila by her first name.

Reynolds to the hospital. When they arrived at the hospital, Birk ran inside, screaming "I need help." Tr. Vol. 4 p. 60.

[4] As a result of being shot, Reynolds suffered a fractured jaw and "a laceration to the tip of her tongue." *Id.* at 185. She also lost some of her teeth and a significant amount of blood. Reynolds underwent three surgeries, and she was in the hospital for two-and-a-half weeks. While still in the hospital, and four days after the shooting, Reynolds remained unable to speak. When the police spoke with her, she wrote a note to Detective Rick Saltsgaver ("Detective Saltsgaver") stating "[Birk] didn't mean to do it." Tr. Vol. 2 p. 137.[9] After Reynolds was discharged from the hospital, she was under Mark's care while Monroe took care of her children for six days before she next spoke to Detective Saltsgaver to tell him that Birk "mean[t] to [shoot her]." *Id.* at 49.

[5] On April 1, 2021, the State charged Birk with: Count 1, aggravated battery causing serious permanent disfigurement as a Level 3 felony; Count 2, pointing a firearm at another as a Level 6 felony; and Count 3, carrying a handgun without a license as a Class A misdemeanor. On September 17, 2021, the State amended the information to add Count 4, attempted murder as a Level 1 felony. From February 28 to March 7 of 2022, a jury trial was held.

---

[9] State's Exhibit 113 is a note written by Reynolds stating that Birk "didn't mean to." Tr. Vol. 5 pp. 78–79. The exhibit in the record only contains a cover page stating, "STATE'S EXHIBIT 113 — EVIDENCE BAG – NOTE FROM [REYNOLDS][,]" but does not contain the note. Despite the absence of the note in the record, the parties do not dispute what the note says.

[6] Birk sought to introduce testimony regarding Mark's and Monroe's use of the word "n***er" in reference to Birk and their racial animus towards Birk. Neither Mark nor Monroe testified at trial, but they did testify outside the presence of the jury during an offer of proof. Both Mark and Monroe denied using the word "n***er in reference to Birk." *See* Tr. Vol. 6 pp. 36, 43. Mark also stated that Reynolds had told him that Monroe used the word "n***er" in reference to Birk. Reynolds stated that Mark had never used the word "n***er" when referring to Birk, but that Monroe had "called [ ] Birk a [n***er]" before. Tr. Vol. 5 pp. 221–22. Birk also called Kyle Smith ("Smith") and Sheila to testify during the offer of proof. Smith stated that Reynolds had told him that Mark "referred to [Birk] as a n***er" and when Smith ran into Mark on the date of the shooting, but after the shooting had occurred, Mark asked Smith: "why would you ever be friends with a [n***er] that [sic] would do something this awful to my daughter [Reynolds?]" Tr. Vol. 6 p. 96. Sheila stated that Reynolds had told her that Mark "said he didn't want that [n***er] in his house. And that if messing with a [n***er] is what [Reynolds] chose to do, then, he was willing to put her and her kids out of the townhouse." *Id.* at 100. Sheila also testified that while Reynolds was on the phone with Monroe, she overheard Monroe say: "I done told you [sic] about driving by my house with that fucking [n***er] boyfriend of yours in the car." *Id.* at 103.

[7] Ultimately, the trial court denied Birk's request to introduce evidence regarding Mark's and Monroe's racial animus towards Birk, ruling that such evidence was "collateral." *See* Tr. Vol. 3 p. 120; Tr. Vol. 5 p. 226; Tr. Vol. 6 p. 52–53.

[8] During preliminary jury instructions and again during the final jury instructions, Birk objected to the State's jury instruction regarding intent, alleging that the instruction was "misleading if it [was] stated that way" and asked for the instruction to be reworded. Tr. Vol. 2 p. 102. The trial court denied the request both times. Birk was found guilty on all four counts. Birk now appeals.

## Discussion and Decision

### I.       *Exclusion of Evidence of Racial Bias*

[9] Birk argues that the trial court erred when it excluded evidence of the racial animus of Mark and Monroe because it curtailed his right to confront and cross-examine them under the Sixth Amendment. "[W]hen a constitutional violation is alleged, 'the proper standard of appellate review is de novo.'" *Ackerman v. State*, 51 N.E.3d 171, 177 (Ind. 2016) (quoting *Speers v. State*, 999 N.E.2d 850, 852 (Ind. 2013)). The Sixth Amendment's Confrontation Clause provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. However, "it does not provide for cross-examination that is effective in whatever way, and whatever extent, that a defendant might wish." *Watson v. State*, 134 N.E.3d 1038, 1044 (Ind. Ct. App. 2019) "[T]he accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Marley v. State*, 747 N.E.2d 1123, 1132 (Ind. 2001).

[10]    Birk wanted to elicit testimony from Reynolds, Mark, Monroe, Smith, and Sheila that Mark and Monroe had referred to Birk by the racial slur "n***er." Birk argued that Mark's and Monroe's racial animus towards Birk provided, at least in part, Reynolds's motive for changing her characterization of the shooting from an accident to an intentional act. [10] Indiana Evidence Rules 401 and 403 set the framework for our analysis. First, we must determine whether the excluded evidence was relevant. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Ind. Evidence Rule 401. The evidence, if probative, must be excluded if the prejudicial nature of the evidence substantially outweighs its probative value. *See* Ind. Evidence Rule 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."). "When determining the likely unfair prejudicial impact, courts will look for the dangers that the jury will (1) substantially overestimate the value of the evidence or (2) that the evidence will arouse or inflame the passions or sympathies of the jury." *Carter v. State*, 766 N.E.2d 377, 382 (Ind. 2002) (citing *Evans v. State*, 643 N.E.2d 877, 880 (Ind. 1994)).

---

[10] Any party, including the party that called the witness, may attack the witness's credibility. Ind. Evidence Rule 607.

[11] First, we must consider whether the excluded testimony is relevant. Birk's theory is not that Reynolds harbored racial animus towards Birk, but that the racial animus of Mark and Monroe influenced Reynolds to testify at trial that Birk shot her intentionally, in apparent contradiction to her hospital note stating that Birk "didn't mean to do it." Tr. Vol. 2 p. 137. When Reynolds next spoke to Detective Saltsgaver to tell him that Birk meant to shoot her, she had been in Mark's care for six days while Monroe took "care of the kids." *Id.* at 49. During Reynolds's recovery from her injuries, she relied heavily on both Mark and Monroe to provide her housing and assistance with her children. Birk's theory is that Reynolds changed her story about whether the shooting was intentional due to her financial and emotional reliance upon Mark and Monroe, not because she shared their racist views or disliked Birk due to his race. The probative value of the evidence of the racial animus of Mark and Monroe to explain Reynolds's motive changing her story from "[Birk] didn't mean to do it" to "[Birk] did mean to do it[,]" *id.*, was minimal, at best.

[12] We next consider whether the evidence was prejudicial, and if so, whether the prejudice substantially outweighed its probative value. Birk relies on both *Tompkins v. State*, 669 N.E.2d 394 (Ind. 1996) and *Kimble v. State*, 659 N.E.2d 182 (Ind. Ct. App. 1995). In each case, it was determined that the prejudicial nature of the testimony did not substantially outweigh the probative value of the evidence, and therefore, the evidence was admissible.

[13] In *Tompkins*, the defendant shot an African American five times in the head. The trial court admitted evidence that the defendant used the phrase "no n***er

lane" to refer to the road leading to his lake property and evidence from three witnesses regarding the defendant's racial bias to support its theory that the murder was racially motivated. *Id.* at 396–97. The defendant claimed that the trial court erred in admitting the evidence because the evidence was irrelevant. *Id.* at 396. The Indiana Supreme Court concluded that the trial court did not abuse its discretion in determining that the evidence of defendant's racial bias was relevant and created an inference of defendant's motive for the murder. *Id.* at 397. Additionally, the Court noted that even if the trial court had found that the probative value and danger of unfair prejudice of this evidence to be of approximately equal weight, it must be excluded because the rule requires that the danger of unfair prejudice substantially outweigh the probative value. *Id.* at 398; *see also* Ind. Evidence Rule 403. Thus, the trial court did not abuse its discretion in admitting the evidence. *Id.*

[14] In *Kimble*, Kimble was convicted of conspiracy to commit robbery and felony murder. *Id.* at 183. The trial court admitted testimony regarding Kimble's membership in the White Brotherhood, a racially biased organization. *Id.* at 184. The defendant argued that the trial court erred when it admitted that evidence. *Id.* This court concluded that the trial court did not err because Kimble and his cohorts specifically chose the victim because she was a black prostitute and that Kimble stated that he considered himself an "official" member of the organization because he has committed a crime against the black race. *Id.* at 185. This court held that the evidence was highly probative of his

motive for participation in the victim's murder and was not substantially outweighed by the danger of unfair prejudice. *Id.*

[15] Birk points to *Tompkins* and *Kimble* as instances where "the Indiana Supreme Court and the Court of Appeals have determined the racial bias evidence to be relevant and admissible in spite of its potential for unfair prejudice to the defendant." Appellant's Reply Br. p. 8; Ind. Evid. Rule 404(b). Birk's reliance on *Tompkins* and *Kimble* is misplaced because, in both cases, evidence of the defendants' own racial bias was used to demonstrate the motive behind their crimes. Here, Birk attempted to present evidence that was not in any way linked to the motive behind his crime. Neither Mark nor Monroe was present when Birk shot Reynolds and some of the statements that Birk wanted to question both Mark and Monroe about occurred weeks before the shooting. *See* Tr. Vol. 6 pp. 34–35, 103. Evidence of Mark's and Monroe's racial animus towards Birk would have exposed the two men as racially biased, but fails to explain Reynolds's motive for changing her story or disliking Birk.

[16] There is no question that the introduction of the racially charged testimony posed a substantial risk that the jury may attribute the racist views of Mark or Monroe to Reynolds, thus leading to unfair prejudice, confusion of the issues, or misleading the jury. The risk of unfair prejudice is even more acute where Reynolds is the sole eye-witness to testify regarding the shooting and the events immediately preceding the shooting. As Birk argued in his brief, the introduction of such evidence would have aroused the passions of the jury since racial bias and prejudice is one of the most prototypical forms of bias and

prejudice known today.  *See* Appellant's Br. p. 30.  Therefore, the prejudicial effect of the excluded testimony was significant.

[17]     We conclude that the prejudicial effect of the testimony substantially outweighed its probative value.  Birk's goal was to challenge Reynolds's credibility and reveal her motives for inconsistencies in her version of events. Evidence of racist remarks that were uttered by Mark and Monroe, who were not present when the shooting occurred, was too remote and unfairly prejudicial to aid Birk in accomplishing his goal.   The trial court did not err in excluding the testimony.

[18]     Even if the trial court's exclusion of the evidence was error, any error was harmless beyond a reasonable doubt.  *See Koenig v. State*, 933 N.E.2d 1271, 1273 (Ind. 2010) ("Violations of the right of cross-examination do not require reversal if the State can show beyond a reasonable doubt that the error did not contribute to the verdict");  *see also Hall v. State*, 36 N.E.3d 459, 468 (Ind. App. Ct. 2015) ("A court determining whether an error is harmless beyond a reasonable doubt must do so on review of the whole record.").  The correct inquiry is whether, assuming that the damaging potential of the cross-examination was fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.  *McCarthy v. State*, 749 N.E.2d 528, 534 (Ind. 2001) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).  Generally, errors in the admission of evidence are to be disregarded unless they affect the substantial rights of a party.  *Montgomery v. State,* 694 N.E.2d 1137, 1140 (Ind. 1998).  In viewing the effect of the evidentiary ruling

on a defendant's substantial rights, we look to the probable impact on the fact finder. *Id.*

[19] Despite the excluded evidence, Birk was able to impeach Reynolds and attack her credibility. For instance, Birk elicited testimony that Reynolds referred to the shooting as an accident. *See* Tr. Vol. 5 p. 79 (Detective Saltsgaver agreed that "[t]he fact that [Reynolds] call[ed the shooting] an accident could be evidence that [it was] an accident."). At trial, Birk highlighted inconsistencies in Reynolds's narrative of what happened on the day of the shooting. *See id.* at 79–86 (Birk argued that for the first time during her testimony, Reynolds testified that she: (1) slammed the brakes twice not once; (2) stopped three times during the drive; (3) was in the driver's seat screaming and rocking; and (4) slammed on the brakes so hard that Birk flew into the windshield). In all those instances, Birk was able to demonstrate the various ways Reynolds's narrative changed. Birk was afforded the ability to attack Reynolds's credibility with respect to her contradictory statements as to whether the shooting was intentional or accidental.

[20] Birk was also able to argue to the jury that Reynolds's financial and emotional reliance upon Mark and Monroe was her motive for changing her story. During his closing, Birk specifically argued that Reynolds's motive for changing her story was so that she could continue to receive assistance from Mark and Monroe while she recovered from her injuries. Moreover, the State presented ample evidence to support their theory that Birk intentionally shot Reynolds, namely:

> The State proved [Birk] announced his intention to shoot
> [Sabrina] before doing so. [Tr. Vol. 4 pp. 33, 37]. The State
> proved [Birk] had both emotional and financial motives for
> wanting [Sabrina] dead, as she was preventing him from using
> her stimulus money for either a new gun, or for drugs. [Tr. Vol.
> 4 pp. 23–30; Tr. Vol. 5 165–66]. [Birk] was about to lose access
> to her money.

Appellee's Br. p. 28–29. *See Standifer v. State*, 718 N.E.2d 1107, 1111 (Ind. 1999) (denial of opportunity to fully cross-examine the witness was harmless beyond a reasonable doubt given the ample evidence introduced to support the convictions). Accordingly, any error on the trial court's part was harmless beyond a reasonable doubt.

## II.    *Jury Instruction*

[21]    Birk next claims that the trial court erred in issuing the jury instruction regarding intent. "The purpose of jury instructions is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Munford v. State*, 923 N.E.2d 11, 14 (Ind. Ct. App. 2010). "The manner of instructing a jury lies largely within the discretion of the trial court and we will reverse only for an abuse of discretion." *Carter v. State*, 31 N.E.3d 17, 25 (Ind. Ct. App. 2015), *trans. denied*. An abuse of discretion occurs where the decision is clearly against the logic and effect of the facts and circumstances. *Fansler v. State*, 100 N.E.3d 250, 253 (Ind. 2018). When reviewing a challenge to a jury instruction, we consider: "(1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the

instruction; and (3) whether the substance of the tendered instruction is covered by other instructions which are given." *Cutter v. State*, 725 N.E.2d 401, 408 (Ind. 2000). For a trial court to have abused its discretion, "the instructions given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury." *Yeary v. State*, 186 N.E.3d 662, 679 (Ind. Ct. App. 2022).

[22] The trial court gave the following instruction over Birk's objection:

> Intent to kill can be found from acts, declarations, and the conduct of the defendant at or just immediately before the commission of the offense, from the character of the weapon used and from the part of the body on which the wound was inflicted.[11]

Tr. Vol. 3 p. 134. Birk argued that the instruction was "confusing, misleading, relieved the State of its burden of proof and presented inculpatory inferences but omitted the converse aspects which would have benefited the jury in its deliberations." Appellant's Br. p. 34. Birk asked for the instruction to be reworded to:

> Intent to kill can be found from acts, declarations, the conduct of the defendant at, just immediately before, or *after the commission of the alleged offense*, from the character of the weapon used on the part of the body on which the wound was inflicted.

---

[11] The instruction was given as both a preliminary and final jury instruction.

Tr. Vol. 6 p. 157 (emphasis added). The trial court denied the request, stating that the proposed instruction "was not a correct statement of law. . . [and] that [the instruction given] is the correct statement of law." *Id.*

[23] Birk argues that the given instruction improperly confined the jury's consideration of evidence of intent to those acts and circumstances at or immediately preceding the shooting and excluded those acts or circumstances that occurred immediately after the shooting. However, the given instruction was a correct statement of law. *See Barany v. State*, 658 N.E.2d 60, 65 (Ind. 1995) ("We have repeatedly held that the intent to kill may be inferred from the use of a deadly weapon; the nature, duration, or brutality of the attack; and the circumstances surrounding the crime.").[12] Furthermore, the given instruction was supported by the following evidence: (1) Birk pulled out his gun, cocked it, and pointed it at Reynolds;[13] (2) firing Birk's weapon required 5.25 pounds of pressure on the trigger;[14] (3) Birk said "I should shoot you" to Reynolds right before doing so;[15] and (4) Birk shot Reynolds in the face from close range.[16] *See Humphrey v. Tuck*, 151 N.E.3d 1203, 1207 (Ind. 2020) ("A trial court may refuse a jury instruction only when '[n]one of the facts' in the record would support

---

[12] We also note that Birk does not direct us to any case law that supports his proposed instruction, nor does he claim that the given instruction was an incorrect statement of the law.

[13] Tr. Vol. 4 pp. 33, 37.

[14] Tr. Vol. 5 p. 140.

[15] Tr. Vol. 4 pp. 33, 37.

[16] *Id.*

the legal theory offered in the instruction."). The evidence presented at trial supported the given instruction.

[24] Birk contends the instruction improperly instructed the jury to not consider any acts and circumstances that may have occurred immediately after the shooting. We disagree. The jury heard evidence of Birk's acts, declarations, and conduct that occurred immediately before, at the time of, and immediately after the shooting. For instance, Birk presented evidence that he: (1) asked witnesses to call 911; (2) apologized to Reynolds after shooting her; (3) drove Reynolds to the hospital; and (4) asked for help when he got to the hospital. This is all evidence that occurred immediately after the shooting and in support of Birk's theory that the shooting was accidental. During his closing argument, Birk argued that his actions after the shooting demonstrate that he did not intentionally shoot Reynolds. *See* Tr. Vol. VI p. 191–92 (Birk emphasized that he immediately picked Reynolds up, shoved her into the van, and drove "like crazy" in order to get her to the hospital for treatment). The jury was instructed to "consider the instructions as a whole[,]" Appellant's App. Vol. II p. 182, and that "[a] person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Appellant's App. Vol. III p. 13. The jury not only heard evidence that supported Birk's theory of an accidental shooting, but, considering the instructions as a whole, was not prevented from considering Birk's post-shooting actions in its determination of intent. *See Carter v. State*, 766 N.E.2d 377, 382 (Ind. 2002) (A conviction will not be reversed for an instruction unless, "considering the instructions as a whole and

in reference to each other . . . the instructions as a whole mislead the jury as to the law in the case."). The instruction given by the trial court was a correct statement of the law, was supported by the evidence, and when considered among the other thirty-one instructions provided to the jury, did not unfairly limit the jury's consideration of relevant facts. The trial court did not abuse its discretion in giving the challenged instruction and refusing Birk's proposed instruction.

## Conclusion

[25] Based on the foregoing, we conclude that there was no Sixth Amendment violation and that the jury instruction was proper. We affirm Birk's conviction of Level 3 felony aggravated battery causing serious permanent disfigurement, Level 6 felony pointing a firearm at another, Class A misdemeanor carrying a handgun without a license, and Level 1 felony attempted murder.

[26] Affirmed.

Bailey, J., and May, J., concur.